## J. R. SIMS v. THE STATE.

### No. 1437. Decided February 23, 1898.

**1. Murder—Evidence—Reputation of Deceased.**

On a trial for murder, the reputation of deceased as a peaceable and inoffensive man is admissible, where defendant has introduced evidence of threats made against him by deceased.

**2. Same.**

On a trial for murder, where evidence of the reputation of deceased for honesty and integrity was admitted without objection, but was afterwards stricken out on motion, Held, no error was predicable.

**3. Same—Defense of Property—Letter of Third Party as Evidence.**

On a trial for murder, which occurred in a dispute between the parties over the right to the possession of a fence and strip of land, a letter from a third party entitled to the land, which recognized the deceased's right of possession, was inadmissible against the defendant, who, at the time of the killing, was, as agent of another, in actual possession, and killed the deceased to prevent him from obtaining possession of the land; defendant having no knowledge of said letter or that such third party had a right to convey the land.

**4. Same—Argument of Counsel.**

Under the facts stated in the preceding paragraph, it is readily perceivable what injury could be done defendant by permitting the prosecuting attorney to contend, as he did in argument, that the possession of defendant was not a legal possession, and that he could not therefore maintain his right to defend against an encroachment upon it.

**5. Witness—Impeachment.**

Where a witness denies that he approached a State's witness and told him that defendant was a particular friend of his, and that he wished the witness would be as light on defendant as possible; that he would never lose anything by it; Held, it was admissible, as going to his credit, to show he had made the statement imputed to him.

**6. Charge—Defense of Property—Good Faith—Title—Possession.**

Upon the facts as stated in paragraph 3, supra, it was error for the court to charge the jury, that in determining the guilt of defendant they could not consider the question of the title to the land, but that they could only consider such title upon the question of defendant's good faith in defending against the unlawful attack of deceased upon the fence. Under the facts stated, it was error to admit evidence to show title in the deceased, the issue being one of right of possession alone.

**7. Same—Charge—Abandonment by Defendant.**

On a trial for murder, where the killing occurred over a dispute about a strip of land and the building and removal of a fence, and it was in evidence that defendant told deceased that he could build the fence over on the land, and that he, defendant, would not bother him because he was an old man, but that if he did build the fence, he (defendant) would tear it down as he intended to hold possession of the land; Held, it was error for the court, upon such facts, to predicate a charge upon the theory of an abandonment of the land by defendant.

**8. Defense of Property.**

On a trial for murder, where the killing was in defense of property, and the proof established the actual possession of the property in the defendant, a conviction would not be authorized unless it was shown, beyond a reasonable doubt, that defendant's life was not imperiled by an attack then being made or about to be made on him by deceased, or that he slew the deceased when he could have prevented the attack upon and the taking possession of the property by deceased by other means short of homicide.

**9. Same.**

One in actual possession of land may kill another, who with several employes to help him is actually pulling down a fence upon the land, which he has forbidden him to do, and especially where deceased has a shotgun in easy reach with which to prevent defendant from interfering with him, and where there are no other means but to kill in order to prevent accused from obtaining possession of the land. Where such an overt act is committed under such circumstances an emergency is created which authorizes defendant to act both to prevent the destruction of his property, and to save his own life.

APPEAL from the District Court of Victoria. Tried below before Hon. JAMES C. WILSON.

Appeal from a conviction for manslaughter; penalty, four years imprisonment in the penitentiary.

This is the second appeal in this case. See Sims v. State, 36 Texas Criminal Reports, 154.

The facts are repeated in the opinion.

*A. B. & W. W. Peticolas, Kearby & Muse,* and *Harris, Etheridge & Knight,* for appellant.—The court erred in submitting to the jury the question as to whether or not Clark, under whose authority the appellant was acting at the time of the homicide, was in the legal possession of the disputed strip of land, the evidence in support of such possession by Clark being undisputed.

The court, in violation of the opinion in this case on former appeal, refused an instruction, requested by the appellant, to the effect that the undisputed evidence showed that Clark was in the legal possession of the land in dispute, and that appellant as his agent was entitled to defend it, and submitted the question of the legal possession of the land as an issue of fact to the jury, to all of which the appellant excepted at the time and afterwards complained in a motion for a new trial and in assignments of error. The appellant also requested the court to charge that deceased was not in legal possession on the day of the homicide, and that any violent attempt by him to secure possession would be unlawful, which was refused. Sims v. State, 36 Texas Crim. Rep., 154; Lilly v. State, 20 Texas Crim. App., 1; White's Ann. Code, 1170.

The court erred in extending the inquiry into the title and right to the possession of the land, and in permitting R. M. Henderson, the surveyor, to testify that he ascertained by survey that the disputed strip belonged to the deceased, and in permitting Louis Foester to testify to facts tending to show the same thing, because under the law the only material inquiry was in respect to the actual legal possession of the land. Sims v. State, 36 Texas Crim. Rep., 154; Behrens v. State, 14 Texas Crim. App., 121.

The court having admitted evidence in relation to the title to the land, over the objection of the appellant, erred in charging the jury that such evidence could only be considered in determining the good faith of the appellant in the defense of an unlawful and violent attack on the said fence by the deceased, etc., and in refusing to charge, as requested

by appellant, that such title might be considered in determining whether Clark was in the legal possession of the land or not. Penal Code, art. 680; 25 Am. and Eng. Enc. of Law, p. 646; 2 Greenl. on Ev., Redf. ed., secs. 614, 618.

The court erred in charging the jury that the title to the disputed property could only be considered in determining whether or not the appellant acted in good faith in the defense of an unlawful and violent attack upon said fence by the deceased, or otherwise, and in refusing to define what was meant by good faith when so requested by the appellant; and in also refusing to charge, at the request of the appellant, that knowledge on the part of Sims that deceased was the true owner of the property in dispute and entitled to possession would not constitute bad faith, and would not abridge his right to defend a legal possession.

The court having, over the objection of the appellant, entered into a full and complete inquiry into the title to the premises in controversy and the right to the possession thereof, erred in limiting the evidence so introduced to the sole question of the appellant's good faith, and in refusing to inform the jury that if Clark had title and right of possession it might also be considered in determining the question whether or not he had a legal possession, because title can always be proven to show the character of the possession. 26 Am. and Eng. Enc. of Law, 646; Parker v. Wallis, 60 Ind., 15, 45 Am. Rep., 703.

The court erred in allowing the State to introduce in evidence, over the objection of appellant, the letter of George H. Scithers to Louis Foester of August 16, 1893, in which the writer acknowledged that the deceased was the owner of the disputed property, and that the investment company claimed no interest therein, because the letter was not authenticated and was hearsay, and not binding on Clark or appellant.

The court erred in refusing to charge the jury, as requested by the appellant, that they should not consider the letter from Scithers to the deceased, if the Phillips Investment Company had never acquired title to the disputed strip from Clark, and if at the time it was written Clark was in the legal possession of the property to which it related, claiming the same under his original title.

To the above, we wish to call special attention to the omission of the court to charge on the doctrine of appearances and reasonable doubt in defining the law respecting homicide in defense of property. The statute provides: "Homicide is justifiable also in the protection of the person or property against any other unlawful or violent attack besides those mentioned in the preceding article, and in such cases, all other means must be resorted to for the prevention of the injury," etc. Rev. Stats., art. 672.

Suppose it reasonably appears to the mind of a defendant whose judgment is unbalanced by reason of a violent and unlawful attack upon his possession, that there are no other means available by which to vindicate his possession and prevent the injury save by taking of life, and acting upon such appearances the defendant does take life, is he guilty of any

offense? We think not.  The law does not require of a defendant in a grave emergency arising without his fault that he should be required to act upon the facts as they really exist, but it only requires that he should act upon the facts as they present themselves to his mind in the perilous situation in which he is placed.  What is apparent is to him real.  The court charged this law in relation to the defense of the person, but declined to charge it in respect to the defense based on defense of property, and the omission of the charge in the one instance, in connection with the giving of it in the other, doubtless impressed the jury that if the appellant could have resorted to any other means and avoided the homicide it was his duty to do so, although such means may not have been reasonably suggested to him at the time and under the circumstances of the homicide.  The court charged the jury that if appellant killed deceased for the purpose of repelling an unlawful and violent attack and preventing the removal of the fence, he should be acquitted if "he resorted to all such other means as was in his power at that time to repel such attack and prevent the removal of said fence."

Reviewing the facts in the light of the testimony of some of the witnesses for the State, it may have appeared to the jury that the appellant acted without first resorting to all other means in his power, but if at the time it reasonably appeared to the appellant that he had exhausted all other means, and that nothing else was left except the force used, he should have been acquitted, and charges to this effect were refused by the court.  We contend that the evidence is wholly insufficient to support the verdict.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at four years in the penitentiary; hence this appeal.

This is the second appeal in this case, appellant having previously been convicted of murder in the second degree, and the case was reversed at the Austin term, 1896, of this court.  For a report of the case, see 36 Texas Criminal Reports, 154.  The facts connected with the case are in the main as developed at the former trial, and we quote substantially therefrom, as follows: "The facts of this case show that the homicide occurred in regard to a dispute as to some 200 or 300 acres of land.  Said land was situated in Calhoun County, Texas, and was in the pasture of one H. C. Clark, who resided at Dallas, Texas.  The defendant, J. R. Sims, was his manager on his ranch in Calhoun County.  It appears that the pasture of said Clark and the deceased, Foester, joined, being separated by a line of fencing between the two; said fence line having been placed there by Clark, or those from whom he purchased, some years before the homicide.  The deceased claimed that the fence was not on the correct line, and that there were some 200 or 300 acres of land belonging to him in Clark's pasture.  This question as to boundaries seems

to have arisen in the spring of the year 1894, and the homicide occurred on the 2d of October of that year. The deceased claimed the land, and insisted on moving the fence on the true line as claimed by him. This Clark declined to agree to, but it seems, however, that at one time he was willing to surrender the 300 acres on that side of the pasture, provided the deceased would give him 50 acres adjoining his pasture at another place, so that he could straighten his line of fencing. The deceased refused to agree to this. The deceased on several occasions urged the removal of the fence, and said a month or two before the homicide that he was going to move it at all hazards. He was told that, if it was his land, he ought to sue for it; but he insisted that it was his, and he would move the fence and take his land anyhow. Clark, shortly before the homicide, wrote the defendant, his manager, a letter, dated from Dallas, in which he told him substantially not to permit Foster to move the fence or get possession of the land, and directed him 'to hold the same in a mild but as firm a manner as possible.' A few days before the homicide, the deceased sent some hands over into the pasture of Clark, to dig post holes. They dug a number, preparatory to moving the fence up on that line. The defendant saw them, and forbade their digging any more holes, and required them to get out of his pasture. On the morning of the 2d of October, 1894, about 8 or 9 o'clock, deceased, with some three or four hands, came to the line of fence in question, for the purpose of taking it down and moving it on the line in Clark's pasture, as claimed by him. The hands preceded the deceased there in a wagon. He came on a little while afterwards, riding horseback, accompanied by one Peter Barnes, and was carrying his double-barreled, breech-loading shotgun. About the time he arrived the defendant also came up to the line of fence, and they spoke to each other. As to the facts immediately attending the homicide, the State's witnesses, some three or four in number, give substantially the same account, while the defendant alone, in his testimony, gives a different account of the matter." We quote from the testimony of Peter Barnes, who was a principal State's witness, as given on this trial, as follows: "He [Foster] rode up to the fence. The men were standing there when we got there. Mr. Sims got there before we rode up. Mr. Foster says: 'Good morning, boys; why are you not at work?' They made the remark that they were waiting 'for Peter; Peter told us to wait for him.' He said, 'All right,' and said 'Good morning, Mr. Sims.' And Sims says: 'Good morning, Mr. Foster; are your folks all well?' Foster says: 'Boys, it's time for you all to go to work.' I was on my horse, and he told me to get down, and take the fence down, and go to work. I had the pinchers in my hand. I got down, and went to the fence. And Sims says: 'Don't you touch that fence;' and I said to Foster: 'Sims says not to take that fence down.' I did not bother the fence. Foster says: 'I have got you hired; I want you to take it down.' I said I wanted the law on my side. 'If you will pull the fence down, I will go over.' He walked up to the fence, and laid his gun on the ground.

38 Texas Crim. App.—41

He had the gun across his lap.  He took the reins over his horse's head, and turned him loose.  When he had laid his gun down, he walked to the post, knelt down, lit his pipe and began to smoke.  Mr. Sims says: 'Mr. Foster, you can't come over this fence.  You can build no fence over here.  I was instructed by Mr. Dallas Clark.  I am a poor man, and work for my living; if I do not do as I am instructed, another will get my place.'  Mr. Foster said: 'Will you get into trouble for another man?' and asked Sims, 'Where are your papers?'  Sims said: 'I have none.'  Foster said: 'I have mine at the house, and can show them.'  Foster said: 'I do not want anything but my own.  I want to take this wire down, drive over, and put up posts, and take down just as much fence in one day so that our cattle won't mix.  You have had my land long enough; I want to use it myself.'  Sims says: 'I told you, you can't come over.'  The old man walked to the post, where he laid his gun down.  He laid it right under the fence.  We walked to the other post.  Sims rode from one post to the other.  Mr. Sims turned his horse's head to Port Lavaca, put his hand on the post, and said: 'You can't come over here.'  Mr. Foster said: 'I am going to build my fence.  I do not want Clark's land.'  Sims said: 'You can build the fence.  I won't bother you; but, Mr. Foster, let me tell you: if you were not so old a man, I would show you what I would do with you.  You are too old a man.'  Mr. Foster said: 'Well, I am an old man, it is true.'  Mr. Sims had his hand on the post, looking right at him, and remarked: 'If you build the fence, I will tear it down.'  Mr. Foster said: 'Don't you know the law about tearing down fences?'  I said to Sims: 'If you will tear it down, please do not tear it down too close; cut it down far enough behind so that it will not slack.'  Mr. Foster said: 'The idea of you saying if I was not an old man!  You would not fight a fly.'  He was pulling the top staple.  He was pulling with both hands.  He stooped down, had the pinchers in his hand, and was pulling the second staple, facing south.  He had on a wide-brim hat.  I heard Lawrence at my back say, 'Look out, Peter.'  Had my bridle reins on my arm, and the wire fence cut me in the hand.  My horse pulled back.  I looked around, turned my head, and looked right into the barrel of the pistol; and, before I could say a word, the old man jumped right straight up and fell.  Sims had shot him."

The first bill of exceptions raises the question as to the admissibility of the character of deceased as being a peaceable and inoffensive man.  It is shown by the bill that said testimony was admitted after defendant had introduced evidence of threats made by the deceased against him.  We think the action of the court in this respect was proper.  See Russell v. State, 11 Texas Crim. App., 288.  It also appears that the testimony as to the deceased's character for honesty and integrity was admitted, but this was without objection.  On motion, it was stricken out by the court.  In this there was no error.

Appellant reserved a bill of exceptions to the admission of a certain letter purporting to have been written by one George H. Scithers, on behalf of the Phillips Investment Company.  Said letter bears date Au-

gust 16, 1893, and in effect recognizes the right of Foster to the disputed strip of land, which was the cause of the homicide. In this connection it will be noted that it was shown that some time previous to this the Garcia survey had been conveyed by Clark to the Phillips Investment Company. On some information derived by the Phillips Investment Company that the strip on the west or southwest boundary of said Garcia survey was in dispute between Foster and Clark, they required Clark to make them another deed, including some other adjacent land, eliminating the disputed strip. Clark's later deed to them included merely 6000 acres of the Garcia survey; and, in connection with the disputed strip, it was claimed by him that said survey exceeded 6000 acres of land. The effect of the second deed was to leave in Clark the disputed strip; and it was so understood at the time the second deed was made, and was subsequent to the homicide reconveyed to Clark by the investment company. It will also be noted that there was no change in possession at the time of the conveyances by Clark to the investment company. He still retained the possession of the portion conveyed to the Phillips Investment Company under a lease from them, and still retained possession of the disputed strip in his own right. There is further evidence to show that, prior to the homicide, Sims was not made aware of this letter or its contents. Appellant assigns a great number of objections to the admission of this testimony, but it will only be necessary to notice a few.

Under our understanding of the evidence in regard to this matter, the title to this strip of land, as between Clark and the Phillips Investment Company, remained in Clark, who already had possession and retained possession. This being the case, we can not comprehend how the investment company could dispose of Clark's land, or give Foster any right to the strip in question, or any right to the possession thereof. There is no privity between Clark and the investment company so far as the disputed strip in question, and the investment company had no more right to dispose of it than any other party. But concede that the investment company had the right to confer title in Foster, and give him the right of possession; Sims was not aware of it. He was in possession, and the matters must be viewed from his standpoint, and not in the light of some secret understanding between the investment company and Foster. The question of possession was the only one that could be said to be in issue at all in this case; and under the circumstances, as between the investment company and Clark (Clark having possession of this strip), he would have had the right to have resisted an encroachment thereon from the investment company itself.

The evil effect of this testimony is made manifest by another bill of exceptions contained in the record, which was reserved to the argument of the prosecution in regard to this matter. The State contended in the argument that the Phillips Investment Company, according to the terms of said letter, had relinquished its title to said disputed strip to the deceased, and recognized his right as superior. Under this line of argument, which was excepted to, the jury would be liable to infer that

the possession of defendant was not a legal possession, and that he could not, therefore, maintain his right to defend an encroachment thereon as if he had the legal right of possession to said disputed strip. This is particularly apparent when viewed in the light of the court's charge on this subject. By said charge, the jury were instructed that they could not consider the title to the land in the case in determining the guilt of the defendant, but could consider it as a circumstance in determining whether he acted in good faith in the defense of an unlawful and violent attack upon said fence by the deceased. Let us suppose that he did not act in good faith; then what about determining his guilt? How is it possible for the jury to pass upon the good faith of the defendant with reference to the land disconnected with the subject of guilt? Again, suppose the jury should believe from the letter that the title to the disputed strip was in Foster. Now, then, they could look to that fact in passing upon the good faith of the defendant in defending his possession of the premises. We think these propositions demonstrate the inadmissibility of the evidence, the remarks of the counsel, and the error in the charge of the court.

Doubtless, for the purpose of impeaching the witness Peter Barnes, the defendant asked him if he did not tell one S. A. Drody (naming the time and place) that he could have told a great deal about the case in the examining trial in favor of Sims if Sims' lawyer had asked him about it, to which he replied that he made no such statement. And defendant further asked him "if he did not tell Drody that Foster told Sims, at the time of the homicide, he would not fight a fly, and then shook his fist in Sims' face, and, at the time Foster was shot, he did not know whether Foster was reaching for his gun or not," to which the witness answered "that no such conversation occurred." The State was then permitted, over the objections of the appellant, to prove by said Barnes that he had a conversation with Drody, at the time and place inquired about, in which Drody said to him: "Peter, Mr. Sims is a particular friend of mine. I wish you would be just as light on him as possible"—to which the witness replied: "I never had nothing in particular against Mr. Sims, but I must tell the truth about this killing." Drody then said: "You will never lose anything by it. Mr. Sims will always be a friend of yours, and help you as far as he can in any trouble you may get into," etc. While this testimony was not introduced in the regular way, yet, Drody having been subsequently placed on the stand, the testimony was admissible simply as going to his credit.

A good deal of testimony was introduced with reference to surveys made on the premises, and with reference to the claim of Foster to the disputed strip of ground, for the purpose of showing title in Foster. All of these facts were inadmissible for such a purpose.

Nor should the court have submitted, as he did, the issue of possession or abandonment of possession on the part of the defendant. The law should have been applied to the case then before the court. The fact that appellant was in the actual possession of the strip of land over

which this homicide occurred is undisputed by any evidence in the record. In the instruction by the court, the legality of appellant's possession should have been assumed as a fact, because it was the foundation of his defense. As to the abandonment of possession, the court gave the following instruction to the jury: "If, however, you find from the evidence that the defendant was not in the legal possession of said fence, or if he once had such possession of said fence, and afterwards abandoned the same, prior to the time of the killing of the deceased (if you believe he was killed), then, and in either or both of such events, he could not justify himself in killing the deceased to prevent such attack upon or removal of said fence by the deceased." We presume that the court predicated this charge upon certain testimony of one Peter Barnes. The expressions are: "Sims said: 'You can build the fence; I won't bother you. But, Mr. Foster, let me tell you: if you were not so old a man, I would show you what I would do with you.'" And again: "If you build the fence, I will tear it down.'" These are the only expressions which we can cull from the entire body of this testimony which give the least color to the pretense that there was ever any abandonment of possession by appellant; and to say that these expressions, given their utmost tension in that direction, authorized the belief that there was then an abandonment of possession by appellant, is but an idle play upon words, and a perversion of the meaning of language. The testimony shows that, for some time previous, appellant was engaged in preventing Foster from getting possession of said land. On Thursday preceding the homicide, he made Peter Barnes, and others with him, whom he found digging holes in his pasture for the purpose of moving the fence, desist and leave the premises. Foster had been apprised of this. On the particular morning, he brought Barnes and his men back with a wagon. Two men in a wagon had preceded Barnes and deceased. Appellant met them at the fence. When deceased and Barnes came up, an altercation began between deceased, Foster, and appellant with regard to moving the fence. Deceased asked the hands why they did not go to work. They replied that they were waiting for him. Without so much as making a request of appellant, deceased told Barnes to tear down the fence. Appellant then interfered, and told Barnes that he could not tear the fence down. He told deceased that he could not tear it down; that he was there to keep possession. Barnes himself, in his testimony, shows that he was afraid to attempt to tear the fence down, and told deceased to do it, and that he would then go on with the work. Deceased took the pinchers, and laid his gun down, within reaching distance. An altercation of words was still going on between him and appellant with regard to the land. Under the testimony of Barnes, which is the strongest in favor of the State, there can be no pretense of abandonment of possession on the part of the appellant. He stood there on his side of the fence, protesting, telling the parties that he was there to prevent the fence being torn down. Under our view of the case, the court had no right on any evidence to instruct the jury on the question

of abandonment. Such an instruction was a perversion of the testimony in this case, and was of a character calculated to impair the defendant's rights, and lead the jury to believe that there was testimony to that effect, and that the court believed that there was an abandonment,

The theory of the defense was that he was justified in killing the deceased on either one of two grounds: First, that he had the right to prevent the destruction of the fence; and that, while exercising this right, deceased attacked him in such measure as to cause him to reasonably believe that his life was in danger. This theory was based alone on the defendant's own testimony. His other contention was that he was there protecting his possession to his property, the same being in his actual possession, and that he used the only means to prevent the destruction of the fence and the taking possession of the land by the deceased. The last theory springs out of the testimony for the State as well as that of defendant. As stated before, the proof established the actual possession of the property in the appellant; and the State could only procure a conviction by showing beyond a reasonable doubt that appellant's life was not imperiled by any attack then being made or about to be made on him by the deceased, or that appellant slew deceased when he could have prevented the destruction of the fence, and the taking possession of the property in dispute by deceased, by other means short of homicide. When all the testimony in the case is looked to, these issues alone were presented, and the court's charge should have been confined to these issues. But instead of pursuing this course, as stated before, a mass of testimony regarding the title, and absolutely irrelevant, was admitted in the case; and, besides this, the learned judge who tried the case committed a number of errors in the charge, some of which we have already pointed out. These were of a character to prejudice the rights of the appellant.

Payne's Case, 8 California, 341, reported in Horr & T. Cas. Self.-Def., p. 863, expresses our views as to the rights of the defendant under the peculiar facts in this case more cogently than we can, and we refer to what is said in that case. We understand that this whole controversy, culminating in the homicide of the deceased, was in regard to a strip of land which the proof showed, without any controversy, had been in the uninterrupted and peaceable possession of appellant and those under whom he claimed for a period of about twenty years. His was not a constructive possession, but an actual possession, as it had been inclosed with a fence and had been used as a pasture during all these years. Our statute (article 677, Penal Code), if it has any meaning at all, was intended to guard and protect a person in possession of property, whether it be realty or personalty. The controversy here was with regard to the possession of a piece of real estate; and the possession of such property, under the law, has a great deal of meaning, and with such tender concern is it regarded under our law that special proceedings have been created for trying this possessory right—that is, the proceeding by forcible entry and detainer. This procedure was intended, un-

doubtedly, among other things, for the purpose of keeping the peace, as men become excited over this right of possession of realty to a greater extent than perhaps any other character of property. The law intends to conserve the right of the possessor against the aggressions and trespasses of all others, requiring claimants not in possession to resort to legal methods to settle such disputes. As appears from the testimony in this case, deceased had been repeatedly told that, if he had a claim to the land, to bring suit for it. To this he replied that he would take possession when he got ready; and when they engaged in the altercation in which the homicide ensued, according to the State's own testimony, defendant told deceased that, if he put his fence up in his inclosure, he would tear it down, and the deceased asked him if he did not know the law against tearing down fences. It seems that he was not willing to be governed by his own law in this matter. On the fatal morning when deceased and his four employes came there, they came as trespassers. They were armed; and, from their acts and conduct and what had previously transpired, appellant had a right to believe that they came with the predetermination to disregard all his protests, and to destroy, at all hazards, that line of fence, and to erect an inner line, thus taking from him the possession of property which he was then actually occupying. Under the circumstances, it occurs to us that he had a right to believe that they intended to move the fence, and to take possession of the land, if they had to kill him in order to accomplish their purpose. Situated as he was, he had the right to stand in defense of his property. The law did not require him to leave the field, and go and seek reinforcements in order to prevent the removal of the fence, much less to appeal to the law. They were five to one. Deceased himself was armed with a weapon superior in its power of execution to the pistol with which appellant was armed. While he (deceased) was pulling down the fence his shotgun was in easy reach. Appellant did not have to wait until his adversaries had gotten him in their power or placed him hors de combat. The only criterion which the law erects is, if he was not able to prevent them destroying his property and taking possession of his land by other means than slaying, he had a right to slay. Now, what other means should he have resorted to? Not until he had entreated and protested without avail, and when his adversary, either with his shotgun then drawn and presented (according to the defendant's testimony), or within easy reach, began the work of destruction, coupled with the contemptuous remark, "You would not fight a fly," did appellant undertake to act. Of course, if there were other means then present of which he might have availed himself to prevent the destruction of his property and the taking possession of his land, the law required him to adopt such means, and only in the contingency of his failure to resort to other reasonable means would he be amenable to the law. After a careful review of this testimony, it occurs to us that, if he had resorted to other means than that which was adopted by him, he would have given his adversary an undue advantage, and he would not only have failed in the protection of his

property, but would have sacrificed his own life. The overt act had already been committed, and in the emergency he was authorized to act both to prevent the destruction of his property and to save his own life. The judgment is reversed and the cause remanded.

*Reversed and remanded.*