## Lee Arnwine v. The State.

### No. 3151. Decided June 26, 1906.

**1.—Murder in Second Degree—Evidence—Reputation of Deceased—Uncommunicated Threats.**

Upon a trial for murder, where no communicated threats had been proven and defendant had not attacked the reputation of deceased as a quiet and peaceable man, the court erred in permitting the State to introduce evidence of the quiet and peaceable character of the deceased.

**2.—Same—Dying Declaration—Suggestion by Third Party—Change of Statement.**

Upon trial for murder, the evidence showed that while the declarant was making his dying declaration, questions were asked him before he had finished his statement, and it was suggested to him whether he was not mistaken in his statement that at the time he was shot he was facing defendant, whereupon declarant stated that he did not know whether his back was turned to defendant or not when defendant shot him. Held, the court committed error in instructing the jury not to consider this last statement of declarant. Either the whole or none of the dying declaration upon this crucial point in the case should have gone to the jury, as this qualification of declarant bore directly upon the position of the parties at the time of the fatal shot.

**3.—Same—Charge of Court—Self-Defense—Threats—Negative Charge.**

Where upon trial for murder, the evidence did not show communicated threats by the deceased, but there was evidence of an uncommunicated threat, and that the deceased made an attack upon defendant or threatened to do so, the court's charge on the law of threats was improper and used uncommunicated threats as the means of eliminating or minimizing defendant's right of self-defense, and perhaps curtailing the law of manslaughter. See opinion for court's charge on threats which was error.

**4.—Self-Defense—Charge of Court—Restricted Charge.**

Upon a trial for murder, where the evidence showed that the deceased pulled defendant from his horse so that the latter struck the ground, and it was a question whether defendant's mind was thus enraged beyond cool reflection, the question of manslaughter was suggested, and the same should have been submitted to the jury without a combination of other facts as necessary to make or constitute adequate cause.

**5.—Same—Self-Defense—Manslaughter—Affirmative Charge.**

Upon a trial for murder, where the issues of manslaughter and self-defense were raised by the evidence, the law applicable to these issues should have been submitted in an affirmative manner and favorable to defendant, and not in a negative, restrictive and argumentative manner.

**6.—Same—More Than One Assailant.**

Where upon trial for murder the evidence showed more than one assailant against defendant, he was entitled to a charge on self-defense as against both.

Appeal from the District Court of Cherokee. Tried below before the Hon. James I. Perkins.

Appeal from a conviction of murder in the second degree; penalty, sixty years imprisonment in the penitentiary.

The opinion states the case.

No brief for appellant on file.

*J. E. Yantis,* Assistant Attorney-General, for the State.

DAVIDSON, 'PRESIDING JUDGE.—This is the second appeal. The conviction was for murder in the second degree. Some five or six years prior to the occurrence narrated in this record, appellant and one of the deceased brothers, Lester Lattimore, had a fight at a party. From that time on there was ill feeling between them until the killing. Deceased (Clyde Lattimore) and appellant were on friendly terms. These were all young men; Lester Lattimore, being 23 and Clyde and appellant each about 21 years of age at the time of the killing. From the time of the fight at the party, some years prior to this tragedy, appellant avoided Lester on all occasions in order to keep out of trouble with him, generally getting some one or more of his friends to accompany him, when there was prospect of meeting Lester. On the day of the killing appellant had been to the town of Jacksonville, passing by the residence of Sam Lattimore, father of the two deceased boys, going and returning. As he was passing the elder Lattimore's, on his return from town, the two deceased brothers were harnessing their team, which they hitched to a buggy directly, and followed on down the road, overtaking appellant some distance before they reached

the gate leading into the "lower farm" of the elder Lattimore. The tragedy occurred at this gate. The buggy containing the boys who were killed on reaching the gate made a semicircle in order to enter it, which threw the rear end of their buggy across the road, reaching within a few feet of a sweet-gum tree, from which projected some limbs. Clyde Lattimore (for the killing of whom this conviction was had) got out of the buggy to open the gate. At this juncture appellant passed around the buggy and, to use his expression had to "duck his head" in order to pass under the projecting limbs from the sweet-gum tree; and in passing around the buggy his leg scraped or touched the hind-wheel, whereupon Lester Lattimore caught him by the coat and pulled him off his horse. The coat was buttoned, and in pulling him off, the button tore out and upward the cloth from the coat, leaving the button hanging by the strip. When appellant reached the ground Lester drove the buggy inside the field, and appellant asked him, "what in the hell he meant," and repeated this question. Finally Lester Lattimore called him a God damn son-of-a-bitch, and reached for his target rifle, which was in the bottom of the buggy. When he did this, appellant began shooting, and fired three shots at Lester, which caused his horses to jump, and by this means threw Lester down in the foot of the buggy. Clyde came toward appellant, putting his hand toward his pocket, and used an expression which appellant did not understand further than the use of the word, "God damn," the remainder not being understood. He then fired two or three shots at Clyde who turned away. Lester, who had gotten out of the buggy in the mean time, reached for the target gun which was in the buggy, and appellant fired six more shots at him, one of which proved fatal. This is practically the defendant's side of the case.

The State's theory is made largely by the dying declaration of Clyde, to the effect that when appellant rode up to the rear of the buggy he began cursing Lester Lattimore, and drew his pistol and began shooting him; and that Clyde approached him for the purpose of getting the gun from appellant to prevent the killing of his brother, and appellant shot him. This is practically the State's case, omitting a great many of the details and prior facts and incidental matters.

Over appellant's objection the State was permitted to introduce evidence of the good character or reputation of the deceased Lester Lattimore in regard to his being a peaceable and quiet man. The basis for this exception was that he had not attacked the reputation, nor had he proved communicated threats of deceased. At this point it should be stated there was evidence of a threat introduced by appellant as having been made by Lester Lattimore a month or so before the tragedy, but this threat was never communicated and appellant knew nothing of it until after the homicide. We believe this exception is well taken. Under article 713, Penal Code, a defendant may introduce evidence of threats, but these shall not afford justification, unless deceased at the time did some act manifesting an intention to

execute his threat, and wherever threats are proved, the reputation of the deceased may be put in evidence. But this rule would apply only where the threats have been communicated, and not where uncommunicated. Our decisions have gone to the extent of holding that, under the provisions of this article, after proof of the communicated threat, the State may introduce evidence of the good character of the deceased, even when defendant has not sought to do so. Russell v. State, 11 Texas Crim. App., 288; Rhea v. State, 37 Texas Crim. Rep., 138; Sims v. State, 38 Texas Crim. Rep., 642. But this has never been extended, so far as we are aware, to instances of uncommunicated threats. So we believe that this exception was well taken.

Exception was reserved to the introduction of the dying declaration of Clyde Lattimore. Without going into a detailed statement of this matter we are of opinion that a sufficient predicate was laid to admit the dying declaration. While the declarant was making his statement questions were asked him. Perhaps he had finished two-thirds of the dying statement, when they began plying him with questions. He stated that at the time he was shot he was facing appellant. At this juncture, Dr. Longmier asked him if he was not mistaken about it; stated that could not have been true, that he was shot in the rear part of the leg and not the front. Whereupon declarant stated he did not know whether his back was turned to appellant or not when appellant shot him. The court eliminated this statement, and instructed the jury not to consider it; at least it was not permitted to go to the jury. Exception was reserved, with this elimination, to the introduction of the dying declaration, and Drake v. State, 25 Texas Crim. App., 293, is relied upon as authority. Upon another trial this statement of deceased, if the dying declaration is introduced, should also go to the jury. This statement was upon a crucial point in the case. The theory of the State was that Clyde was not engaging in the difficulty, and that the shooting was not justified. Appellant's theory was that he was advancing upon him, making a demonstration towards his pocket, as if to get a weapon and upon this statement he relied largely to show the unreliability of the declaration. This declaration bore directly upon the position of the parties at the time the fatal shot was fired that killed Clyde; and it bore strongly upon the weight the jury might or might not attach to the dying statement of deceased. He had stated that he was facing appellant at the time of the shooting, and when the doctor called his attention to the fact that this could not be true, that he was shot in the back instead of the front of the leg, he then admitted that he did not know what position he was occupying at the time he received the shot. As before stated the dying declaration of Clyde was perhaps as strong—if not the strongest evidence introduced by the State, tending to show the homicide was unjustifiable. Upon another trial, therefore, the excluded statement should be permitted to go to the jury if the dying declaration is introduced in evidence. In Drake's case, supra, it was held that because

a declarant had stated that his former statement was incorrect in some particulars, it was not admissible. Here was a statement by declarant which the court eliminated. There would have been no error in the elimination of this testimony if the statement was irrelevant or immaterial. Wherever that is the case the court should eliminate and not permit it to go to the jury. The rule is well stated in regard to that character of testimony in Krebs v. State, 3 Texas Crim. App., 348, as follows: "The dying declarations of a party are only admissible in evidence on the trial of a homicide, where the death of the deceased is the subject of the charge and the circumstances of the death are the subject of the dying declaration." Wherever the dying declaration comes within this rule, it is admissible; otherwise it is irrelevant and should be excluded. The statement of Clyde that was excluded was directly in regard to the tragedy and his connection with and knowledge of the transaction. Therefore, the court had no authority to reject this. In Felder v. State, 23 Texas Crim. App., 477, it was held that conflicting statements of a declarant could be introduced as impeaching the dying declaration as admitted, to be weighed by the jury. The dying declaration should have been rejected after the court eliminated the statement that deceased did not know how the shooting occurred. The dying declaration admitted as emasculated was not the dying declaration of the deceased.

Appellant reserved exceptions to several portions of the charge, some of which we think are well taken. For instance, the court charged the jury: "If, however, defendant was not jerked or pulled off his horse by Lester Lattimore, and Lester made no demonstration as if to use a gun, such as above mentioned, and defendant raised the difficulty and shot him because or on account of previous ill will or merely because he was afraid Lester would some time attack or harm him, then in such case, the killing would not be reduced below murder, no matter how much excited, angry or alarmed defendant may have been at the time of the killing, for the law is, that threats, even to take life, and no amount of fear caused by such threats afford any justification for the killing of the person threatening by the person threatened, unless the party who has made such threat, at the time of the killing, by some act then done, manifests an intention to execute the threat so made." This is the only reference to threats made in the charge. In view of our statute in regard to threats and its bearing upon the issue of self-defense, this charge as given not only does not present the law, but is negative, in character and restrictive of the right of self-defense under such an emergency. If communicated threats were facts in the case and relied upon as a part of the self-defensive theory, then the court should have given a proper charge in regard to it, and so charged it as to present appellant's defense as to this matter in an affirmative way, and authorized the jury to acquit, if his life had been threatened by Lester, and Lester did some act or manifested an intention to execute the threat. If communicated threats were not

in the case, appellant was ignorant of that fact, and it could not have operated upon his mind as an inducement to do the killing, and his defense under these circumstances was entirely independent of threats. The jury would have to look to other facts adduced to solve this theory favorably to the accused. As we understand this record it does not show communicated threats. As before stated, there is evidence that deceased, Lester Lattimore, had made a threat to the effect that if appellant ever spoke to him again he would kill him. But this was entirely uncommunicated to accused until after the killing. The quoted charge does not present the law of threats but it uses uncommunicated threats as the means of eliminating or minimizing appellant's right of self-defense, and perhaps curtailing the law of manslaughter, as might be shown by a further analysis of the charge.

The court further charged the jury: "If you believe that Lester Lattimore jerked or pulled defendant off his horse, and cursed and abused him and made a demonstration as if to seize, reach for or present a target gun, and you further believe that before the occasion of the alleged killing, Lester Lattimore and defendant had had a difficulty, and that ill feeling arose between them from such difficulty, and continued up to the alleged homicide, and that since such previous difficulty said Lester Lattimore, by words or acts or by both words and acts, had manifested ill will towards defendant and an intention to do him bodily harm, you are instructed that in passing upon the issue of self-defense, you may consider these last mentioned circumstances in connection with all the reasonableness or otherwise of defendant's apprehension of danger, if he had such apprehension at the time of the alleged killing. And if you do not believe the killing of Clyde Lattimore, if he was killed in self-defense, you may nevertheless consider all said circumstances in passing upon the question of whether adequate cause, as an element of manslaughter, existed or not." The latter excerpt from the charge seems to be meaningless. Perhaps there are some words or expressions omitted. This charge seems to be upon the weight of the evidence, and is entirely too restrictive and argumentative. If Lester Lattimore jerked defendant from his horse and cursed and abused him, and made a demonstration as if to seize, reach for or present a target gun, appellant's right of self-defense was thereby matured, and he had a right legally to shoot. It was not necessary to go further, require and make a prerequisite to his right of self-defense that the previous difficulty had occurred between them in the years gone by; and therefore, there was ill will existing from that time forward between the parties. Nor was the combination of these facts necessary to raise the question of manslaughter. If deceased pulled appellant from his horse in the manner indicated by the testimony of appellant, and this enraged appellant's mind beyond cool reflection, then the question of manslaughter was suggested. Our statute says, where pain is inflicted, or blood drawn from the accused by deceased, that this is adequate cause. In this instance, there

were two boys who had ill will towards each other for years, and were not on speaking terms, and one jerked the other from his horse, riding along the public road, as he was undertaking to pass him. This, in view of the facts, would be adequate cause, and it should have been submitted to the jury as such adequate cause, and this without a combination of other facts as necessary to make or constitute it adequate cause. That the other causes or facts may have added to it may be conceded. But these should not be restricted by requiring other causes to be added to cause manslaughter.

There are other exceptions to some of the remaining clauses of the charge presenting the issues of manslaughter and self-defense, because on the weight of evidence, argumentative, restrictive and negative. The same may be said of these charges and the exceptions as those already discussed. We desire to say, in a general way, without entering into a discussion of all these, that the law applicable to manslaughter and self-defense should be given in an affirmative manner and present the issues favorable to appellant, not in a restrictive argumentative manner as was done in this case, but directly, affirmatively and pertinently.

It may be well enough to state that, upon another trial the jury should be instructed upon the law applicable to appellant's side of the case from the standpoint of more than one assailant, in a direct and pertinent manner, for if Lester Lattimore, as appellant stated pulled him from his horse and seized his target gun for the purpose of shooting him, and Clyde knowing this joined or entered into the attack on him or made demonstrations as defendant viewed it, then he was entitled as much to self-defense against both as he was against Lester Lattimore. The law was strongly charged for the State. For the reasons indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Brooks, Judge, absent.