EPHRAM DECKARD v. THE STATE.

No. 14229. Delivered June 10, 1931.

The opinion states the case.

*J. Q. Henry,* of Mission, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for ten years.

Appellant resided on a small farm about three miles from town, where he had a crop of cotton, corn and melons. The stock law prohibiting the running at large of animals was in force in the community. Appel-

lant had been poundmaster, but had been discharged six months prior to the homicide. A short time prior to the homicide appellant had taken up two head of mules belonging to deceased, C. H. Latham, and had placed them in his pens, claiming that the animals were running at large in his field and damaging his crops. After some argument, deceased had paid for the release of the animals. About five days prior to the homicide appellant had again taken up about three head of stock belonging to deceased. Deceased came for his stock, but refused to pay the amount of damages appellant claimed. Deceased left, saying that he would return later. On the morning of the homicide deceased drove to appellant's premises and again demanded his stock. Appellant refused to release the stock unless deceased would pay him three dollars for caring for the animals and damage they had done to his crop. The pen in which the animals were inclosed was locked. Deceased took an iron bar, broke the gate and entered the pens. While deceased was breaking the gate appellant went to his house and got a shotgun, which he brought back to the pens. At this point we quote the dying declaration of deceased as follows: "I went to the home of E. Deckard who claims to be poundmaster for the county at Mission. He had put up my mules, never notified me that he had them. He wanted to charge me two prices for them. I offered to pay him a reasonable price. He refused to release them to me. I picked up a piece of iron to pry off a slat and turn my mules out. His wife closed the gate upon me. He was standing there with a shotgun. I begged him not to shoot me but he did. I never threatened him or offered to strike him at any time during the time we talked before he shot me or after he had done so."

Touching the circumstances immediately surrounding the homicide, a witness for the state testified, on his direct-examination, that deceased told appellant to unlock the gate; that appellant left the pens and went away; that while appellant was away deceased picked up an iron bar (meat bar) and pried a piece of board off the gate and slipped the chain out; that while deceased was engaged in opening the gate appellant approached with a shotgun, telling deceased to get out of the pen; that at this time deceased had already gotten the stock and was leading them out of the pen; that as. deceased backed away appellant shot him.

Appellant testified, in substance, that deceased had threatened to do him bodily injury for taking up his stock; that on the occasion when deceased came to his pens he ordered him (appellant) to open the gate; that he refused to open the gate unless deceased paid him the amount he was asking for damages and caring for the stock; that deceased cursed him, seized an iron bar and broke the gate open; that he tried to prevent deceased from leading his stock out of the pen; that he got his gun for the purpose of frightening deceased into leaving the gate alone; that when he returned deceased was coming towards the gate leading a mule, and

holding the iron bar in his right hand. At this point we quote the testimony of appellant as follows: "I come on back and shoved the screen open and gets my gun and starts on out there and he come right on up to the gate and asked my wife to get back from the gate. She says 'No, don't come through' and she kept holding her hand on the gate and he asked her in rough language to let him through, 'G— d— you, let me through.' She says 'No' and he shoved her hands off of the gate and shoved the gate back and knocked her down and he come on through leading the mule and the other mule and the horse follows. As he came on straight towards me I asked him to stop. He says 'No, I am not going to stop, I'm coming on through.' I stepped backwards two or three steps and asked him to stop again; he says 'No, G— d— you, you get out of my way, I'm coming on through.' I stepped on back a few feet further backwards and as I done that he dropped this rope out of his left hand and he had this iron something like this in his right hand and the rope in his left hand as I asked him to stop, but instead of him stopping he dropped the rope and grabbed the iron and as he made the motion with the iron of course the shot fired. I fired the shot to keep him from hitting me with the iron and killing me and preventing him from taking the stock only by law. When the shot was fired we were something like five or six feet apart, something along there. I had a double barrel sawed-off sixteen gauge shotgun; I expect a half foot had been sawed off of the barrel. As I fired the shot the iron came out of his hands over towards the toe of my shoe on the ground."

Appellant's wife gave testimony substantially the same as that of appellant.

The court correctly charged on self-defense and defense of property. The charge on the defense of property was qualified by the court as follows: "If, on the other hand, the defendant impounded said animals from other premises than his own, if you so believe and find from the evidence beyond a reasonable doubt then his possession would not be legal and he would not be justified in killing the deceased to prevent the forcible removal of said property from his premises, and you should convict him unless you find that the killing was justiable under some other paragraph of this charge."

Appellant testified on cross-examination by the state that he took up deceased's stock out of his (appellant's) field between 7 and 8 o'clock in the morning. He said the animals were in his corn patch. In rebuttal the state placed a witness on the stand who testified that he saw deceased's stock between 7 and 8 o'clock in the morning on vacant property. On his direct-examination the witness stated first that the animals were 1,000 paces away from appellant's field. He immediately qualified his statement by saying that they were 300 paces from the field, and finally stated that he meant feet instead of paces. He testified further that after seeing

the animals he left and was gone for about fifty minutes; that upon his return he saw them in appellant's pen. We think this testimony was insufficient to warrant the court in submitting the legality of appellant's possession to the jury. The state had assumed throughout the trial that appellant had properly impounded the animals. The state's contention seems to have been that he was demanding unreasonable compensation for the care of the animals and the damage done to his crops, and that in attempting to prevent deceased from removing the animals from the pen appellant used more force than was reasonably necessary when he fired upon deceased. The dying declaration of deceased was to the effect that appellant was demanding unreasonable compensation for the release of the animals. Appellant testified that he found the animals in his field. The fact that a state's witness had seen the animals near the field 50 minutes before they were impounded would not, in our opinion, have warranted the jury in concluding that appellant took the animals from some place other than his field. The opinion is expressed that the charge had no support in the evidence. It was calculated to impress the jury with the view that the court thought appellant had taken up the animals from land not belonging to him, and that, therefore, his possession was illegal. In the instruction by the court, the legality of appellant's possession should have been assumed as a fact, as there was no evidence in the record sufficient to raise the issue that appellant did not in fact take the animals from his own field. Sims v. State, 38 Texas Crim. Rep., 637, 44 S. W., 522; Sims v. State, 36 Texas Crim. Rep., 154, 36 S. W., 256.

Appellant did not claim that he was attempting to act as poundmaster of the city of Mission when he impounded deceased's animals. Over a proper objection, the state proved that appellant had theretofore been poundmaster of the city of Mission and had been discharged some six months prior to the homicide. This testimony was irrelevant and immaterial. The fact that appellant had been discharged tended to prejudice him in the eyes of the jury.

Over proper objection the state proved that appellant had taken up other people's stock during a period of time extending back three years prior to the homicide. The state also proved that appellant had taken up stock belonging to people other than deceased after he had been discharged as poundmaster. Under facts reflected by the record, the opinion is expressed that all of this testimony was irrelevant, immaterial and prejudicial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.