## Commonwealth *v.* Prophet, Appellant.

Argued November 23, 1931. Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SCHAFFER, MAXEY and DREW, JJ.

*Samuel Moyerman,* for appellant.—It was highly improper for the district attorney to bring before the jury, by means of improper cross-examination, matters which were calculated to prejudice the defendant's case. He thereby insinuated that he had knowledge of those facts without becoming a witness himself, without the sanctity of an oath and without the privilege of cross-examination: Com. v. Shoemaker, 240 Pa. 255; Com. v. Williams, 41 Pa. Superior Ct. 326.

A defendant, on trial for murder, who denies any participation therein, may, in order to show that another committed it without her aid or instigation, offer evidence of a personal grudge borne the deceased by the person who did the actual killing: Com. v. Molten, 230 Pa. 399; Com. v. Hazlett, 14 Pa. Superior Ct., 352; Com. v. Shoemaker, 240 Pa. 255; Com. v. Barille, 270 Pa. 388.

It was not proper to admit evidence on the part of the Commonwealth as to the deceased's good character and good morals after the defense had been precluded from showing the sexual perversions of the deceased.

*Charles F. Kelley,* Assistant District Attorney, with him *John Monaghan,* District Attorney, for appellee.— Evidence is inadmissible to attack the character of deceased: Com. v. Straesser, 153 Pa. 451; Com. v. Greer, 20 Pa. C. C. R., 535; Com. v. Ferrigan, 44 Pa. 386; Com. v. Lenox, 3 Brewst. 249; Com. v. Flanigan, 8 Phila. 430; Com. v. Lockett, 291 Pa. 319.

Self-serving declarations which are clearly not part of the res gestæ are incompetent, and inadmissible: Hartman v. Ins. Co., 21 Pa. 466; Rudy v. Com., 128 Pa. 500.

Where the evidence is introduced to impeach the character of the deceased, the fact that the deceased was a peaceable, law-abiding citizen becomes a relevant circumstance tending to prove the improbability of his having done the unlawful acts of violence alleged against him by defendant: Com. v. Castellana, 277 Pa. 117; Com. v. Jones, 283 Pa. 564.

OPINION BY MR. JUSTICE KEPHART, January 5, 1932:

Clara Grace Prophet, some eleven years ago, was seduced by her employer who became the father of a daughter of hers born out of wedlock. This child was cared for by defendant's mother, and, sometime after 1922 when she married Prophet, the deceased, was brought to live in the family. Marital difficulties soon arose, and multiplied as the years passed. Two children were born of the union, Warren 7½, and William 5½ years of age.

About the middle of September, 1930, after Mrs. Prophet and her husband had a quarrel, she then, for the first time, conceived the idea of killing him; but as she had been elected to attend a church convention in a distant city, she deferred her plans until her re-

turn home. Upon her return home, although no definite plan was formed until later, she still retained the idea of getting rid of her husband.

About November 6th, Mrs. Prophet's brother Harold, who happened to be at her house, spoke to her about his financial difficulties and said he would like to have $500. His sister replied that she was disgusted by troubles and quarrels with her husband and that it would be worth that sum not to live the life she was living. Further conversation turned to her husband's life insurance, and Mrs. Prophet told her brother that it amounted to about $3,000; $2,000 in one company, $1,000 in another, and a third, $260 on a weekly premium policy. Harold remarked that the $260 would be sufficient to bury him. Nothing further developed at this time. On November 18th, Harold again visited his sister and asked her if she was still planning the death of her husband. She said she was, and their plan for the murder was then discussed though no date fixed. Mrs. Prophet was to give him a key to the front door of the house, he was to enter, ransack the house and give it the appearance of a burglary. After this he was to go upstairs to the bedroom and make a noise to waken Prophet, who was expected to mistake him for a burglar. Harold was then to choke Prophet to death, wearing gloves so as to leave no clue. If he was successful in killing Prophet, he was then to strike his sister and choke her so that when the police arrived, she would have an excuse for not sending in an alarm. Harold was to bring with him a revolver, so that, if he did not succeed in choking Prophet to death, he might kill him with the revolver. He was then to make his escape through the back window or the back door.

On November 21st, Harold and his wife paid another visit to Mrs. Prophet's house, and he sent his wife out to get a paper so as to give the conspirators an opportunity to complete their plan. Harold asked for the key to the home and she pointed it out on a teacart,

and he got the key. In connection with her subsequent denial that she took any part in the crime, it is interesting to note that her brother, in testifying on her behalf, admitted that she pointed out the key on the tea wagon to him, although he denied taking it. For what purpose other than in the furtherance of their common criminal design, would she have pointed it out to him? Harold said he would come between midnight and four o'clock, and although the night was not mentioned, Mrs. Prophet took it for granted he would come during that night.

Prophet retired at about eleven o'clock, and she retired later. They occupied a double bed in the front room of their home. She did not go to sleep, but lay awake, awaiting the appearance of her brother. Harold meanwhile had gone home but returned during the night, parking his car a square from the house. At four-thirty he entered the house and what followed we relate in her own words. She said: "I had not went to sleep all night, as I was expecting Harold's arrival. I heard Harold moving in the bedroom, and then I could see his shadow on the window shades, indicating Harold was standing alongside of the bed, where my husband was lying. He stood over my husband's bedside for fully five minutes before making any movements to commit the murder. The next thing I heard was a thud, as though my husband had been struck over the head with an instrument. My husband groaned and rose up in the bed, showed resistance. Harold and my husband wrestled on the bed and both rolled over me onto the floor. I got out on the opposite side of the bed, where my husband had been lying, and I ran around to the foot of the bed, to the doorway. I stood near the door afraid to move. Thus I was in a position to clearly see the struggle of my brother and my husband on the floor. During this struggle I distinctly saw my brother twice strike my husband over the head with the revolver. I then heard my husband say, 'All right, fellow, I give

up, I'll give you all my money, I'll tell you where it is.' My brother never said a word, but I heard two shots, but did not see my brother fire them, as he was lying on top of my husband with his back towards me."

After the killing, Harold ran downstairs. He did not go out the back door or the back window as he had arranged, but went out the front door and disappeared. On leaving, he went over to the store where he had at times been employed, and there hid the revolver between the rafters in the cellar. He then went to the store where a brother of his was employed, and hid the key of the house in that cellar. He then started back to his farm in the country.

Mrs. Prophet, after picking up a cartridge from the floor and throwing it into the toilet, put on her shoes, washed some blood off her hands, went downstairs, put on her overcoat, crossed the street, and informed some taxicab drivers her husband had been shot by a burglar. The cab dispatcher notified the police and Mrs. Prophet went to the house with the taxi drivers. She told these men in a conversation which took place in the room where the deceased was lying, that she had been in bed asleep and was awakened in bed by a man rolling over her. When she got up she found her husband had been shot and was lying on the floor. She appeared calm, not in the least excited. She showed no signs of grief, and informed the persons assembled that her husband was dead. The witnesses found the pillows and sheets on the bed mussed up and covered with blood. When she was interrogated as to why her nightgown had no blood on it, although her bathrobe had blood on it, she said that possibly blood had been splashed there when "my husband was hit on the head." Later she informed them and the officers that her husband had treated her well. Afterwards, at police headquarters, both Mrs. Prophet and her brother made confessions. Defendant's confession, in writing and signed by her, was offered in evidence; and this ended the Commonwealth's case.

Mrs. Prophet's defense was that she was not a party to the crime; that she was asleep in bed and was awakened by the appearance of her brother on the morning of November 22, 1930; that she did not know he was coming, nor did she expect him; that when he rushed into the room she asked "who was there?" Her brother replied by addressing her husband, "Bill, I have come to thrash this thing out with you." Then, referring to his conduct as a sexual pervert, he said "You have ruined your wife, you have tried to ruin your little boy, and you also tried it on me." "Unless you promise to let Grace go, or give me your solemn promise that you will let her alone, I am going to thrash this thing out with you." A struggle then ensued between them in which Prophet was killed. While the struggle was going on, she said she ran to the foot of the bed calling to them to stop.

She admitted finding the cartridge on the floor and putting it in the toilet, opening the window and calling for help; also that she told the taxicab drivers and the police that the killing was done by a burglar, but that all of this was untrue, as it was only a plan of her own to shield her brother. She denied any agreement to bring about the killing.

She admitted that she saw and signed the confession introduced by the Commonwealth, but claimed that its contents were entirely different from the information which she gave the police. Her version of the story which she told the police officer covers some 30 pages of the record. It depicted a wretched life with her husband, who, according to her story, had become very abusive because her first child, Ruth, the illegitimate, was living with them; he severely criticised her management of household affairs; and she was subject to various sexual abuses practiced not only on her, but on one of her children. She said her brother was aware of these conditions, and a week prior to the killing had upbraided her husband about his conduct toward his

family. Yet it appeared from her own testimony that Prophet was under some financial strain, and was scarcely able to make ends meet. Expenses for the home which had been purchased, and for interest on the mortgage, repairs, insurance, taxes, light, and telephone, together with the sum of $20.00 a week which Mrs. Prophet received for household expenses, and several dollars contributed every week for the support of his mother, consumed all his earnings. The Commonwealth in rebuttal showed Prophet to be outwardly a man of exemplary habits.

The jury disbelieved her story, as well they might, and returned a verdict of first degree murder, fixing the penalty at life imprisonment. Mrs. Prophet was very fortunate; from the evidence the jury would certainly have been warranted in fixing a sterner penalty.

The questions raised on this appeal relate to trial errors, and many are directed to the cross-examination of the accused as to her version of the confession she alleges that she related to the police officer. Her defense was that she took no part in the killing, did not know it was to take place, and had no agreement with her brother to slay her husband. The only way to get her story of marital relations before the jury was to give her version of the confession to contradict that actually contained in the signed document. No doubt the real purpose of this evidence was to incite the sympathy of the jury by placing before them a picture of her supposed deplorable married life, and thus relieve her from responsibility for the act committed. The statements pictured the deceased in the darkest light possible, and could have been very easily manufactured.

Under circumstances such as this, the latitude to be permitted by the trial court in cross-examination is very broad. It was entirely proper for the district attorney to cross-examine the accused as to these revelations, with a view of testing her credibility. While neither their truth nor falsity was in issue, whether or

not she actually stated these facts to the police was in issue. Therefore, inquiries as to the improper relations with her employer, a married man with two children, the birth of her child, the conduct of the child's putative father towards it and her, her relations with him after its birth, the receipt of money from him, her knowledge of his other unlawful acts, were all proper subjects for cross-examination since they were directly traceable to her own testimony in which she had pictured herself as a good woman who had been wronged by her employer and her husband.

The court did not err in refusing to permit her brother to testify as to his relations with the accused or to detail the offenses practiced against him by the deceased. Previous difficulties or quarrels between deceased and others than the defendant would be incompetent under the defense here pleaded. For the same reason it was incompetent to show the brother's hostile feeling toward deceased, or his reason for carrying a revolver. Whether it should appear that he intended to kill Prophet on account of his conduct or whether he carried the revolver for his own protection in going to work, was immaterial since defendant knew nothing of the revolver or his intent. See Com. v. Straesser, 153 Pa. 451; Tiffany v. Com., 121 Pa. 165; Com. v. Ferrigan, 44 Pa. 386; 30 C. J. 173, section 396, also 197, section 424. The question for the jury was, did she participate in the act? The defendant said she did not, her brother corroborated her, but the Commonwealth proved that she did and the jury believed the latter's story. The evidence rejected as here discussed would not tend to show there was no collusion between Harold and his sister.

The truth of the statements in her version of the confession would not show she told these facts to the police, nor would their falsity prove she did not tell them. Extraneous circumstances such as when Harold discovered Ruth was an illegitimate child, whether he was in debt, or any of the evidence rejected would not have

proven what transpired when she made her confession. She had denied that a money transaction was involved, but whatever tendency her denial may have had to disprove the confession given to the Commonwealth, this matter was conclusively settled by her brother's statement that he did not seriously need $500. As the case was tried and as the questions were propounded, the answers at best would show a motive for the killing. The Commonwealth proved a deliberate, premeditated killing, and the motive offered was immaterial: Com. v. Buccieri, 153 Pa. 535. Had this been a case of self-defense, the evidence might have tended to show justification, but, as this was not the defense, it was properly excluded: Com. v. Buccieri, 153 Pa. 535, 544; Tiffany v. Com., supra; Com. v. Ferrigan, 44 Pa. 386, 388.

Conversations with her brother as to her family relations were self-serving declarations and as they were not part of the res gestæ they were inadmissible; ordinarily, conversations with others unless part of the res gestæ are not admissible in behalf of the accused. They are not excluded because they can never contribute to the ascertainment of the truth, but because, if received, they would consist chiefly of falsehoods fabricated for the occasion, and would mislead rather than enlighten: Rudy v. Com., 128 Pa. 500, 507; Com. v. Force, 43 Pa. Superior Ct. 363, 366; Com. v. Principatti, 260 Pa. 587, 600.

Cross-examination is, with a few exceptions, necessarily limited to testimony in chief; and is largely a matter within the sound discretion of the trial judge (Gallagher v. Transit Co., 248 Pa. 304; Glenn v. Phila. & West Chester Trac. Co., 206 Pa. 135; Phila. & Gulf Steamship Co. v. Clark, 59 Pa. Superior Ct. 415) ; therefore, as the record stood, it was not error to exclude questions put to Inspector Connelly relating to the second confession which was not in evidence. Thereafter, when the second confession was admitted and read to defendant, she admitted that she signed it, and she testified as

to its contents. It was then entirely competent for the district attorney to cross-examine her concerning it.

We do not regard any comments of the court as being prejudicial; they furnish no basis for reversal. While night sessions are not always desirable, whether court should be held at night or not is within the discretion of the trial judge.

The admission in evidence of the deceased's good character was proper under the circumstances of this case. The pointed attack made on the deceased by the alleged narration of deceased's conduct to the police officer, opened the door to the admission of such character evidence. Ordinarily, the character of the deceased is not in issue, and is normally brought into the case only when there is a plea of self-defense, and then under well defined limitations, but as defendant, for the purpose we stated above, pictured Prophet to be a moral degenerate, it was proper for the State to show the good character of the man who was killed. Evidence of general reputation for violent or bad character on the part of the deceased is not essential to render admissible evidence of his good character; it may be proved in a case where the defense has shown particular traits of character such as quick temper, violence, easily provoked, or likely to provoke a difficulty, though no evidence of general reputation as to bad character has been given: Wharton on Homicide (3d edition) 439, section 270. See Com. v. Castellana, 277 Pa. 117; Com. v. Jones, 283 Pa. 564; 1 Wigmore on Evidence (2d edition) 285, section 63. "The State can of course offer the *deceased's peaceable character*, when the issue of self-defense has been raised, even though the defendant has not first introduced the deceased's violent character; though most courts thus far are singularly loath to accept this dictate of logic and fairness. The same question may arise where the homicide is said to have been provoked by some *other immoral act* of the deceased [italics ours]."

The charge of the court was fair. That portion of it which instructed the jury that evidence of the alleged sexual perversions on the part of the deceased afforded no excuse for the taking of human life, and should only be considered in connection with the credibility of witnesses, was a correct exposition of the law.

Complaint is made that the district attorney by innuendo implied that the defense had been "framed" by the defendant and her counsel. Possibly the district attorney had good reason to believe this, but there is nothing in this record which indicates that he so stated his views.

We have discussed all the material assignments of error; those omitted are immaterial. An examination of the record shows all the ingredients of murder in the first degree; the accused had a fair trial and the record presents no reversible errors.

Judgment is affirmed, the record is remitted so that defendant may comply with the sentence.