STATE OF WEST VIRGINIA *v.* MARTHA PUSEY

(No. 8432)

Submitted September 30, 1936. Decided December 8, 1936.

*J. Q. Hutchinson* and *McGinnis, Ashworth & Mann,* for plaintiff in error.

*Homer A. Holt,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for the State.

MAXWELL, JUDGE:

In the criminal court of Raleigh County, Martha Pusey was indicted for the murder of her husband, C. B. Pusey. She was convicted of voluntary manslaughter and sentenced to penitentiary confinement of five years. The circuit court affirmed. The matter comes now for review on writ of error to the said action of the circuit court.

The defendant and the deceased had been married for about seventeen years. For several years last preceding the tragic ending of their marital relations, they had

lived together at Glen Morgan in Raleigh County. He was a mechanic, working for the Chesapeake & Ohio Railway Company, at Raleigh, near where they lived. At the time of his death, he was sixty years of age and she was about twenty years younger. They were large people. He was a stockily built man weighing about 225 pounds; her weight is about 200. They owned their home and a contiguous vacant lot, also another residence property adjoining the vacant lot on the other side, the three fronting on a state highway. The second residence was leased to Ralph Starkey and his wife.

Late Sunday afternoon, September 15, 1935, deceased returned home from his work, went to his room on the second floor and changed his clothes. After a short time, he went to the Starkey home where he was in the habit of making frequent calls. Deceased and Mr. and Mrs. Thomas Young ate supper with the Starkeys that evening. The Youngs left soon after the conclusion of the meal. Pusey remained for about three-quarters of an hour after the Youngs had departed. Then he went home. There was at that time no one in the house but Mrs. Pusey. A. H. Clendenin, a veteran railroad man, and Howard Wolfe, a boy of eighteen, roomed and boarded at the Pusey home, but they had eaten their evening meal with Mrs. Pusey and had left the house. In response to a question as to what happened when her husband came in the house, she testified: "He came in and I asked him to eat supper. He said he had done been to supper, said he had eat supper over at Starkeys. I said it looked like he could eat at home instead of running over there eating all the time." She said further that he then violently seized her by the hair and, with an oath, declared he would kill her; that in the ensuing scuffle, she grabbed from the buffet a revolver for the purpose of striking him with it; that he dragged her out of the house, saying that he was going to take her to the Starkey home and compel her to apologize to Mrs. Starkey (presumably for some supposed reflection upon the latter); that he held her by the hair and one wrist and forced her to the steps of the front porch of the Starkey resi-

dence; that, at that point, she succeeded in changing the revolver from her left hand to her right and then, in fear that he would take her into the Starkey home and kill her, she shot him.

Four or five bullets were discharged from the revolver into the body of Pusey. The Starkeys, attracted by the shots, ran immediately to the porch, saw the deceased gasp and expire, and the defendant in the act of departing from the Starkey front lawn toward her own home.

The defendant relies on self-defense.

It was the jury's province, under proper instructions from the court, to weigh the claim of self-defense, and, if, in their judgment, that defense should be rejected, then, to determine the degree of defendant's guilt. This, the jury has done. They may very properly have considered that there was small likelihood the deceased would undertake to kill the defendant or inflict serious bodily injury upon her in the Starkey home where he was trying to take her; that the circumstances were not such as to justify the defendant in believing at the time that such was the intent and purpose of the deceased. One may not kill merely because he is being subjected to an unwarranted assault. If attacked, he may kill in self-defense, provided he has reasonable ground to believe, and does believe, that he is in danger of death or great bodily injury. *State* v. *Cain*, 20 W. Va. 679. If the appearances at the time do not warrant such belief, the homicide will not be excusable. It is not consonant with human experience that a person bent on inflicting grievous or fatal injury upon another would force the victim into the presence of witnesses for the consummation of the act. But, of course, the defendant was terribly enraged by the conduct of her husband toward her as he dragged her from her home and sought brutally to force her into the Starkey home. Naturally, she was humiliated and angered. The jury thought she fired the fatal shots in heat of passion. Such is voluntary manslaughter. "Any unlawful and intentional killing, even by the use of a deadly weapon, when the passion of the slayer is suddenly aroused upon some great provocation, is voluntary

manslaughter, and not murder." *State* v. *Michael*, 74 W. Va. 613, 620, 82 S. E. 611, 613, L. R. A. 1915A, 533. We think the jury correctly appraised the situation. The verdict was not against the weight of the evidence. The result cannot be disturbed on writ of error unless there was prejudicial error in the conduct of the trial.

The defendant urges other points of error, following.

A point is grounded on the action of the trial court in permitting several witnesses introduced by the state to testify, on rebuttal, to the good reputation of the deceased as a peaceable and law-abiding citizen. The defendant insists that because she had not adduced testimony discrediting such reputation of the deceased, it was improper for the state to go into that matter on rebuttal. While it is true the defendant did not by testimony introduced on her behalf directly impugn the general reputation of the deceased as a law-abiding citizen, there was substantial defense testimony tending to establish hostile and threatening disposition of the deceased toward the defendant for a considerable period of time prior to the homicide. Witnesses introduced on behalf of the defendant testified that the deceased was cross with the defendant; that he drank intoxicating liquor; that he would cast aspersions upon her and her people and would make fun of her cooking; that he was grouchy with her — never uttered a kind word; that he would not talk with her — at times would not speak to her; that he spent much time at the Starkey home. The defendant testified in conformity with these statements of her witnesses, and further said that on several occasions within the last seven years the deceased had threatened to kill her.

In an effort to meet this line of testimony of the defendant and her witnesses, the state had the right to adduce testimony tending to establish the good reputation of the deceased as a peaceable and law-abiding citizen, on the theory that it was unlikely a man who had so lived as to establish a good reputation for peaceableness would be guilty of the conduct which the defense imputed to him. "On a trial for murder, it was proper

to admit evidence that deceased was peaceable and inoffensive, after defendant had introduced evidence of threats by him." *Sims* v. *State,* 38 Tex. Cr. R. 637, 44 S. W. 522. The holdings of many courts point the same way. Consult: *State* v. *Todd,* 28 N. M. 518, 214 P. 899; *State* v. *Feeley,* 194 Mo. 300, 92 S. W. 663; *Cody* v. *State,* 23 Okl. Cr. 236, 214 P. 201; *Commonwealth* v. *Prophet,* 307 Pa. 122, 160 A. 597; Wharton on Homicide (3d Ed.), p. 439; 30 Corpus Juris, p. 173. Our own case of *State* v. *Arrington,* 88 W. Va. 152, 106 S. E. 445, accords with this view. Therein, on full citation of authority, the proposition is thus stated: "As already noted, evidence of uncommunicated threats is admissible to show the attitude of mind of the deceased, and to aid the jury in determining who was the aggressor in the fight. Such testimony is a direct attack upon his reputation for quiet and peaceable conduct, and evidence of good character in that regard may be admitted to rebut it and to create a countervailing inference that he was not the aggressor." We hold, therefore, that in these circumstances there was no error in admitting character evidence in rebuttal.

Another point: Two witnesses for the defendant were women prisoners in the Raleigh County jail. They were cross-examined as to the cause of their confinement. To this phase of the cross-examination, no objection was made as to one of these witnesses, but as to the other one, there was objection by counsel for the defendant. It is urged now on behalf of the defendant that she was prejudiced in this particular in that the cross-examination tended to discredit these two witnesses. Since these witnesses had freely admitted on direct examination that they were prisoners in the county jail, and, in fact, gave testimony only with reference to observations in respect of Mrs. Pusey while they were prisoners, it does not seem likely that their testimony was discredited by the development on cross-examination that one had been convicted of involuntary manslaughter and the other of larceny. Such matters may be inquired into within narrow limits. We are of opinion that on this

trial, the bounds of propriety were not transgressed. The trial court, we think, acted with reasonable discretion. *State* v. *Price,* 113 W. Va. 326, 167 S. E. 862.

The giving of state's instruction "F" is assigned as error. This instruction, in effect, told the jury that if they believed from the evidence that deceased was of good reputation as a peaceable and law-abiding citizen, then that might be considered in determining whether the defendant or deceased was the aggressor in the engagement which resulted in the latter's death. The same basis of reasoning which justified the introduction of the character evidence, above discussed, warranted the giving of this instruction. The two propositions stand together. In fact, there is only one proposition involving, first, the testimony of character witnesses, and second, the court's pronouncement of the law respecting the same.

The court's action in modifying defendant's instruction No. 11 is also assigned as error. This is the instruction as tendered: "The court instructs the jury if you believe from the evidence that any witness used by the state to testify in this case is unfriendly to the defendant then you have a right to take into consideration such feeling, if any, of such witness in weighing the testimony of such witness, *and it is your duty to view such evidence, if any, with care and caution.*" (Italics supplied). The court struck out the italicized words and gave the instruction as modified. It is a jury's duty to weigh all evidence with care and caution. While it may be taken as a *concessum* that the testimony of hostile witnesses should be weighed with care and caution, and that it is proper for the court to call that fact to the attention of the jury (*State* v. *McDermott,* 99 W. Va. 220, 223, 128 S. E. 108), it does not follow that the elimination of such proposition from an instruction constitutes prejudicial error, especially where the instruction is phrased as the one now under examination. Where a jury is told that they should take into consideration the unfriendliness of witnesses when considering their testimony, it tends to superfluity further to inform them that they should weigh such testimony with care and caution. In

fact, it is somewhat useless and redundant to tell a jury at any time, in respect of particular testimony that care and caution should be exercised in the scrutiny thereof. Such is the duty of a jury as to all testimony adduced before it, and such, we may safely assume, is the attitude in which jurors as a rule approach the discharge of their duties. Therefore, we think the trial court committed no error in eliminating from the instruction the words indicated.

The remaining point of error pertains to the testimony of Thomas Young on rebuttal for the state. This arose in an effort to impeach A. H. Clendenin, who had testified on behalf of the defendant. The foundation was made in this manner. On cross-examination, Clendenin denied that he ever heard the defendant make threats against her husband. Then he was asked if he did not, on the evening of the homicide, tell Thomas Young that he (witness) had heard the defendant say, in effect, that she was going to kill her husband. Clendenin responded to the question with an emphatic negative. Thomas Young, called by the state on rebuttal, testified that on the occasion indicated, Clendenin told him that the defendant had said she was going to kill the deceased.

It is fundamental that a witness may be impeached only regarding matters which are material to the issue. Inasmuch as Clendenin, as a witness for the defendant, had put the domestic conduct of the defendant on a very high plane and had given unfavorable impressions of the conduct of the deceased in his relationship with the defendant, we think that whether Clendenin had heard her make violent threats against her husband was not a mere collateral matter. It was material. And, being such, the state had the right to adduce evidence tending to show that he had made a different statement respecting the same. Therefore, there was no error in the admission of the testimony of Thomas Young on rebuttal.

Discerning no prejudicial error in the record, we affirm the judgment.

*Affirmed.*