Commonwealth *v.* Lopinson, Appellant.

286

288

Argued April 19, 1967. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

 reargument refused November 24,
1967.

*Oscar Spivack,* with him *A. Charles Peruto,* for ap-
pellant.

*Richard A. Sprague,* First Assistant District At-
torney, with him *William H. Wolf, Jr., Edwin Wolf,
Benjamin H. Levintow* and *Alan J. Davis,* Assistant
District Attorneys, and *Arlen Specter,* District Attor-
ney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, September 26, 1967:

Judith Lopinson and Joseph Malito were shot to
death in the basement office of Dante's Restaurant in
the City of Philadelphia about 3:30 o'clock a.m. on
June 19, 1964. Dante's, at that time, was operated by
Jack Lopinson, husband of Judith, and Malito under
a partnership arrangement.

. On July 15, 1964, following the conclusion of a
three-day inquest conducted by the medical examiner

of Philadelphia, Jack Lopinson was charged with the murders and held for action by the grand jury. He was indicted the same day. Subsequently, Frank Phelan was arrested and also indicted for the murders.

On October 26, 1964, Phelan plead guilty to the indictments, and later, following a hearing before the court of Oyer and Terminer of Philadelphia County, was adjudged guilty of murder in the first degree and sentenced to death in each case. We have this day affirmed the judgments. See *Commonwealth v. Phelan*, 427 Pa. 265, 234 A. 2d 540 (1967).

Lopinson plead not guilty and elected to go to trial before a jury. On March 4, 1965, after trial, he too, was found guilty of murder in the first degree in each case and the penalty was fixed at death. Following dismissal of motions for a new trial and in arrest of the judgments by the court en banc, sentences were imposed by the trial judge in accordance with the jury's verdict. These appeals followed.

In accordance with our statutory duty,[1] we have studied the record and it fully supports the convictions and sentences.

The trial evidence was more than ample to establish these facts:

Lopinson requested Phelan to kill both his wife and Malito, to which Phelan agreed; Lopinson drove Phelan in his automobile to Delaware to secure the murder guns for which Lopinson paid the purchase price; the time and place for the commission of the killings were suggested by Lopinson; originally the crimes were planned for two nights prior but at the last minute were deferred; a few hours before the killings, Phelan and Lopinson discussed and finalized the plans in the former's automobile; at Lopinson's suggestion Phelan entered the basement of the restaurant through a rear

---

[1] Act of February 15, 1870, P. L. 15, §2, 19 P.S. §1187.

cellar door and secreted himself, while waiting for Judith Lopinson and Malito to come from the first floor of the restaurant after it closed to the basement office to count the day's receipts; upon their arrival Phelan entered the office with a gun in each hand and summarily shot each victim in the head twice; after Phelan went upstairs and reported the shootings to Lopinson, together they returned to the office and, upon discovering that death had not yet taken its toll, Phelan at the request of and in the presence of Lopinson, fired additional bullets into the heads of the victims. The two then returned upstairs and discussed the explanation previously agreed upon that Lopinson would give the police, namely, that the restaurant had been held up by two unknown men who had fatally shot Judith Lopinson and Malito, and also shot Lopinson. To fortify this story, Phelan, with consent, then shot Lopinson though the fatty tissue of his thigh, and after Phelan left the premises Lopinson fired a bullet from his own gun into a wall of the restaurant. When the police arrived, Lopinson told them the concocted story about the restaurant being robbed.[2]

From the evidence the jury could also find that Lopinson wanted to get rid of his wife for another woman, his mistress; and killing Malito would help solve his financial troubles and render the false robbery story by two unknown intruders more plausible.

Lopinson's excellent counsel (court appointed) challenge the validity of the judgments on a multitude of grounds. It is asserted that a substantial number of rulings in the court below were erroneous, and while "many of the rulings taken separately may not constitute harmful error," the end result was to deny Lopinson a fair trial.

---

[2] At trial Lopinson admitted he gave this story to the police and that it was a lie.

We shall discuss a major portion of the assignments of error in detail.

### Denial of a Preliminary Hearing

Following the conclusion of an inquest conducted by the medical examiner of the City of Philadelphia, Lopinson was held for action by the grand jury without the usual procedure of a hearing before a magistrate or a justice of the peace. This did not void the subsequent judgments.

The Philadelphia medical examiner possesses all of the powers of a coroner by virtue of the provisions of the Philadelphia Home Rule Charter, including jurisdiction to conduct an inquest when sudden, violent or unnatural deaths occur, and to act as a committing magistrate if the deaths are found to be the result of homicide. As correctly stated by the court below: "It has been the law in England and Pennsylvania, at least since 4 Edward 1 Statute 2 (A.D. 1276), that the Coroner has imposed upon him the duty 'to use prompt measures for apprehending persons so charged' (with responsibility for sudden death &c. of another) . . . 'for which purpose he may direct his warrant to the Sheriff for arresting and securing them.'

"3 Henry VII Cap. 1 (A.D. 1486) states, 'The coroner (is) . . . the proper officer to take inquisitions *super visum corporis.*'

"Both of the above statutes of England are the law in Pennsylvania. *Digest of Select British Statutes in Force in Pennsylvania,* by Roberts (1847) p. 106, and XXI, XXXIV ('a coroner's duty after a murder committed').

"The Philadelphia Code of *Ordinances,* 2-102, enacted under authority of the Philadelphia Home Rule Charter, transfers all powers and duties of the Coroner to a Medical Examiner, particularly those 'relating to

the investigation of sudden violent and suspicious deaths and the determination of whether the person or persons responsible shall be charged with crime.'

"If the Coroner (here the Medical Examiner) finds a person responsible for a homicide, it is his duty to commit that person, without bail. Power of Coroner &c., 11 Phila. 387 (1875); Rentschler v. Schuylkill County, 1 Schuylkill Legal Record 289 (1880). When' the Coroner returns his inquisition, an indictment may be found against the person charged. Com. v. Lafferty, 11 C.C. 513 (1892). See also Com. ex rel. Bandi v. Ashe, 367 Pa. 234 (1951); Marvin v. Monroe County, 154 Pa. Superior Ct. 75, 78 (1944)." See also, *Commonwealth ex rel. Tanner v. Ashe*, 365 Pa. 419, 76 A. 2d 210 (1950).

### Refusal of Motion To Quash the Indictments

On the very same day he was arrested, Lopinson was indicted by a grand jury which had already been in session for a two-week period. Lopinson had no prior notice of the presentment of the bills to the grand jury, and it is argued he was completely denied the opportunity of investigating and challenging any member of the grand jury for cause or of challenging the array. A pretrial motion to quash the indictments on this ground was overruled below after hearing.

If Lopinson were denied all opportunity of entering a proper challenge to the grand jury or a member thereof, this would constitute a denial of due process of law and the indictments should have been quashed. See *Commonwealth v. Dessus*, 423 Pa. 177, 224 A. 2d 188 (1966). But such is not so.

As of the date Lopinson was indicted (July 15, 1964) under Pennsylvania law then controlling, a challenge to the grand jury could be entered *either before or after* an indictment was returned; the only time

limitation was that it be entered before the plea in court. See *Commonwealth v. Weiner*, 101 Pa. Superior Ct. 295 (1930); *Commonwealth v. Magid & Dickstein*, 91 Pa. Superior Ct. 513 (1927); and, 17 P.L.E., Grand Jury §4. However, when such a challenge was entered, the burden was upon the complaining party to establish the facts to support the challenge. See *Commonwealth v. Williams*, 149 Pa. 54, 24 A. 158 (1892); *Rolland v. Commonwealth*, 82 Pa. 306, 22 Am. Rep. 758 (1876); *Commonwealth v. Haines*, 57 Pa. Superior Ct. 616 (1914); and, *Commonwealth v. Carlucci*, 48 Pa. Superior Ct. 72 (1911).

When Lopinson filed the motion to quash the indictments here, the lower court fixed a time for hearing and afforded him the opportunity of producing any pertinent fact desired. Nothing was produced to show that the grand jury was illegally impaneled, or any member thereof was unqualified to sit. Hence, Lopinson was given full opportunity to enter a proper challenge to the grand jury, but since he failed to meet his burden of proof the challenge and the motion to quash were properly overruled.

*Commonwealth v. Dessus,* supra, relied upon by Lopinson is inapposite. Dessus was indicted *after* the effective date (January 1, 1965) of Rule 203 of the Pennsylvania Rules of Criminal Procedure, and was, therefore, subject thereto. Under this Rule, a challenge to the grand jury must be made "before the [grand] jurors are sworn unless opportunity did not exist prior thereto; *in any event a challenge must be made before the bill of indictment is submitted to the grand jury. . . .*" (Emphasis added.) Since Dessus was arrested and indicted on the same day and could not under Rule 203, then controlling, enter a challenge after the indictment was returned, he was completely and effectively deprived of his rights in this regard. Again, this is not the case here.

## Refusal To Grant a Continuance

Because of the nature of the crimes and the surrounding circumstances, the case provoked extensive publicity in the Philadelphia newspapers immediately following the occurrence, when the arrests were made, and at the time of trial. Pretrial and during the period of voir dire examination of the prospective jurors, Lopinson moved the court for a continuance on the ground that the extent and nature of the publicity rendered it impossible to secure a jury in the case free from bias and prejudice. These motions were overruled.

There can be no question but that Lopinson was entitled to be tried by a tribunal free from prejudice, passion and bias: *Sheppard v. Maxwell,* 384 U.S. 333 (1966) ; and *Chambers v. Florida,* 309 U.S. 227 (1940). In short, he was entitled to a fair trial and this required that the jury's conclusions be induced only by evidence and argument in open court and not by outside influences. See *Patterson v. Colorado,* 205 U.S. 454 (1907).

While there is no claim made here that any particular petit juror was biased, it is urged that, in view of the publicity, any jury selected in Philadelphia at the time must be held to be presumptively biased. Of course, if Lopinson did in fact receive a fair trial by an impartial jury, this contention is devoid of merit. See *Beck v. Washington,* 369 U.S. 541 (1962). We now turn our attention to that inquiry.

The murders occurred on June 19, 1964, and the arrests on July 15th. In October 1964, Lopinson filed a motion for a change of venue, because of prejudicial publicity, to which the Commonwealth filed an answer denying that the publicity had the effect alleged, but voicing no objection to the request. Shortly thereafter, Lopinson's motion was voluntarily withdrawn.

The trial began on January 19, 1965, seven months after the murders were committed and more than six months after the arrests. Voir dire examination of the prospective jurors began immediately, and a total of 250 individuals were examined before twelve jurors and two alternates were chosen. As each juror was selected, he or she was immediately sequestered and remained so until the verdict was recorded.[3] The fourteenth juror, or second alternate, was accepted on January 28th.

Extensive voir dire examination was permitted and challenges for cause were liberally allowed. Two of the jurors selected for the trial had read nothing about the case; two others were not asked by counsel during the examination if any reading thereof took place; several had read news accounts of the case only "slightly" or superficially; and, none had engaged in an extensive or intensive reading of the news articles pertaining thereto. Each juror selected unequivocally indicated he was free from bias, had not formed any opinion and would enter the trial with an open mind, free from the influence of anything he might possibly have read or heard in connection with the case. Not one of the jurors selected was challenged for cause and there is nothing in the record to indicate that any such cause did exist. Under such circumstances, it is our view that a fair and impartial jury tried the case and we certainly do not feel compelled to find, as a matter of law, that bias or preformed opinion invaded the jury box and influenced the verdict. The contention that an unfair trial resulted on this basis is bottomed on pure speculation. One who claims such an injustice must rely on more than mere guess. Cf. *Beck v. Washington,* supra; *Irvin v. Dowd,* 366 U.S. 717

---

[3] The two alternates were discharged from further duty upon submission of the case to the jury.

(1961) ; and, *United States ex rel. Darcy v. Handy,* 351 U.S. 454 (1956).

## Voir Dire Examination of Jurors

During the voir dire examination of the prospective jurors, the court permitted inquiry concerning their having any conscientious scruples against the imposition of the death penalty in a proper case, and particularly where the proof established the accused did not commit the actual killing, but arranged for someone else to do it for him. If such conscientious scruples existed, a challenge for cause was sustained. This was not error.

Identical questions were asked of jurors in *Commonwealth v. Bentley,* 287 Pa. 539, 135 A. 310 (1926), and approved by this Court. See also, *Commonwealth v. Gelfi,* 282 Pa. 434, 128 A. 77 (1925) ; and, *Commonwealth v. Henderson,* 242 Pa. 372, 89 A. 567 (1913).

As stated in *Commonwealth v. Bentley,* supra, at 546, 135 A. at 313: "In conducting the preliminary examination, considerable latitude must be permitted to elicit the necessary information, but it is to be strictly confined to inquiries disclosing qualifications, or lack of them, and not extended so as to include hypothetical questions, when their evident purpose is to have the jurors indicate in advance what their decisions will be under a certain state of the evidence or upon a certain state of the facts, and thus possibly commit them to definite ideas or views when the case shall be finally submitted to them for their decision. The purpose of the examination in the present case was not to obtain information as to the verdict which the juror would render upon the production of certain evidence, but whether he could consistently render a verdict such as the law contemplated, if the testimony established guilt beyond a reasonable doubt."

Lopinson also contends that the scope of his voir dire examination of the prospective jurors was unduly limited. An examination of the record disclosing the extent of the examination allowed completely refutes this position. Moreover, it is manifestly premised upon the mistaken belief that the purpose of the voir dire examination is to provide a defendant with a better basis upon which to utilize his peremptory challenges.[4] This is not so. As stated by President Judge RICE in *Commonwealth v. Brown,* 23 Pa. Superior Ct. 470, at 498 (1903) : "[T]he right of peremptory challenge is not of itself a right to select but a right to reject jurors." Accord *Commonwealth v. McGrew,* 375 Pa. 518, 525, 100 A. 2d 467, 470 (1953) ; and *Commonwealth v. Morgan,* 280 Pa. 67, 71, 124 A. 339, 340 (1924).

It is further stated in *Commonwealth v. McGrew, ibid.,* that: "The examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury: . . . Neither counsel for the defendant nor for the Commonwealth should be permitted to elicit any information of this nature, or to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case. While considerable latitude should be permitted on a voir dire, the inquiry should be strictly confined to disclosing qualifications or lack

---

[4] In appellant's brief, the following appears in this connection: "Jury selection and voir dire examination is not limited merely to eliciting facts that would constitute the basis for challenge and cause. The voir dire is the only real opportunity the defendant has to learn something of the background and nature of the prospective juror. Even where proper cause for challenge may not exist the defendant is required to decide whether he will allow the prospect to serve or will dismiss the prospect by the exercise of a peremptory challenge."

of qualifications of a juror and whether a juror has formed a fixed opinion or may be otherwise subject. to disqualification for cause. . . .

"It is also well settled that the scope of the voir dire examination rests in the sound discretion of the trial Judge and his decisions, even in a challenge for cause, will not be reversed in the absence of palpable error."

Lopinson also challenges the correctness of the court's rulings sustaining challenges to certain questions asked of the possible jurors. The rulings were correct.

In one instance the question sought to learn if the proposed juror had formed "any opinion . . . regarding the statement of any person connected with the case or with regard to any material fact of the case." The only legitimate inquiry in this area was whether or not the juror had formed a fixed opinion in the case as to the accused's guilt or innocence. See *Commonwealth ex rel. Ryan v. Rundle,* 411 Pa. 613, 192 A. 2d 362 (1963), cert. denied, 375 U.S. 948 (1963).

Other questions in this category sought to examine the prospective juror upon his understanding and acceptance of certain principles of law. This was improper examination: *Commonwealth v. Calhoun,* 238 Pa. 474, 86 A. 472 (1913).

Still other questions sought to discover the jurors' potential reactions if the defendant did not take the stand or produce other evidence. Again, such questions were wholly unwarranted and properly excluded. See *Commonwealth v. Wireback,* 190 Pa. 138, 42 A. 542 (1899).

## Trial Rulings

A Philadelphia police officer received a radio call reporting a shooting at Dante's Restaurant and in com-

pany with another officer went immediately to the scene. In the basement office, he found the dead bodies of the victims and Lopinson sitting on a chair behind a desk. At trial, the officer described what he saw and the conversation he had with Lopinson at this time, including the latter's explanation of how the restaurant had been held up by two unknown men, who had shot the victims during the robbery. Since Lopinson was without counsel at the time and not forewarned of his right to remain silent, it is urged that the use of this evidence at trial was constitutionally proscribed. We cannot agree.

Apart from the fact that the instant trial took place before the effective date of *Miranda v. Arizona,* 384 U.S. 436 (1966), the situation involved was not such as required the police officer to stop and warn Lopinson of his constitutional rights. As of the time involved Lopinson was not in custody, or even a suspect. Further, the officer was merely engaged in a general investigation and an "on the scene" questioning as to what happened. His testimony as to Lopinson's statements under these circumstances, even in the absence of a warning of constitutional rights, was clearly admissible. See *Miranda v. Arizona,* supra; *Commonwealth v. Eperjesi,* 423 Pa. 455, 224 A. 2d 216 (1966); and, *Commonwealth v. Jefferson,* 423 Pa. 541, 226 A. 2d 765 (1967).

Following the homicides and while Lopinson was in a hospital being treated for the bullet wound, he was interviewed by investigating officers who were seeking to ascertain a description of the two alleged hold-up men. Lopinson's then self-retained counsel was present at all times during this questioning and the record clearly proves that Lopinson's statements were truly volunteered, and not the result of any conduct in violation of his constitutional rights.

Phelan appeared as a Commonwealth witness and testified he committed the killings at the request of and in concert with Lopinson. It is argued that the trial judge unfairly restricted counsel's cross-examination of Phelan, the actual killer and Lopinson's co-conspirator. Our reading and re-reading of the pertinent portion of the record fails to sustain the contention.

Phelan was examined for the better part of three days. His direct examination covers forty-one pages of the printed record, and his cross-examination covers five hundred and four pages. While a superficial consideration of some few trial rulings cited in Lopinson's brief might lead one to conclude that legitimate inquiry was denied, a reading of Phelan's entire testimony immediately dispels any such thinking.

It is certainly true that cross-examination is a vital and fundamental part of a fair trial. Full cross-examination of a witness upon the substance of his direct testimony is an absolute right, the denial of which is error of constitutional dimensions. See *Pointer v. Texas,* 380 U.S. 400 (1965), and *Alford v. United States,* 282 U.S. 687 (1931). Moreover, the right of cross-examination extends beyond the subjects testified to in direct testimony and includes the right to examine on any facts tending to refute "inferences or deductions" arising from matters testified to on direct. See *Conley v. Mervis,* 324 Pa. 577, 188 A. 350, 108 A.L.R. 160 (1936).[5] And in cross-examination of an accomplice, such as

---

[5] While certain decisional points in the *Conley* case relating to procedure have been criticized and overruled, *Kline v. Kachmar,* 360 Pa. 396, 402 at n. 2, 61 A. 2d 825, 829 at n. 2 (1948), the vitality of the substantive proposition for which *Conley* is here cited was untouched by *Kline* and has not been subsequently questioned. See *Parente v. Dickinson,* 391 Pa. 162, 165, 137 A. 2d 788, 789 (1958); *King v. Holt,* 200 Pa. Superior Ct. 431, 435, 188 A. 2d 760, 762 (1963). Cf. *Miller v. Pennsylvania R. R. Co.,* 371 Pa. 308, 327, 89 A. 2d 809, 817 (1952) (STERN, J. dissenting).

Phelan, very wide latitude should be permitted. See *Douglas v. Alabama,* 380 U.S. 415 (1965); *Snyder v. Massachusetts,* 291 U.S. 97 (1934); *Commonwealth v. Russo,* 388 Pa. 462, 131 A. 2d 83 (1957); *Commonwealth v. Prophet,* 307 Pa. 122, 160 A. 597 (1932); and, *Commonwealth v. Gable,* 171 Pa. Superior Ct. 468, 90 A. 2d 301 (1952). Again, our study of Phelan's testimony compels the conclusion that a searching, exhaustive and repetitive cross-examination of Phelan was permitted and if a few erroneous rulings were made during the progress thereof, no prejudicial harm resulted. Phelan's version of the conspiracy and killings, his prior relevant statements in regard thereto, his vicious personal makeup and past activities were all the subject of extensive examination and fully exposed for the jury's consideration. In short, the opportunity of placing Phelan in his proper setting before the jury and putting the weight and credibility of his testimony to an adequate test was not denied.

During one of the trial recesses, Phelan, in the absence of the trial judge and the jury, allegedly made a vulgar remark manifesting intense hatred for those of the Jewish religion.[6] During cross-examination, counsel asked Phelan if his testimony against Lopinson was "based on his hatred of his (Lopinson's) religion", to which Phelan replied, "No. I like Jack Lopinson." In answer to another inquiry, he categorically denied making the statement attributed to him. Additionally, his personal feelings for Lopinson before and after the killings were carefully explored. The trial judge refused to permit inquiry as to Phelan's possible prejudice and bias towards the Jewish people generally, and sustained an objection by Commonwealth's counsel to a specific question seeking to as-

---

[6] Commonwealth's counsel, who was nearby, admitted the utterance of a vulgar remark by Phelan directed towards Lopinson's counsel, but denied anything was said about the Jewish people.

certain just what Phelan did say during the recess involved. While the last mentioned ruling appears to be too restrictive in view of the examination theretofore permitted, we do not consider it to constitute prejudicial error.

During his cross-examination, Phelan manifested belligerency and refused to answer a few questions. Lopinson's request to have the court direct him to answer or to strike all of his testimony from the record was denied. This is assigned as error, because it is asserted the questions were proper inquiry in an attack on his credibility.

These questions involved the circumstances incident to Phelan's arrest and subsequent treatment by the police, and whether or not he was coerced into confessing and testifying against Lopinson; his test firings of the guns, following the purchase thereof before the killings; his use of drugs, particularly during the days immediately before the commission of the crimes; and, his admitted desire and urge to kill.

A trial court should not permit a witness to decide what questions he will answer. This is the court's sole prerogative, and it has been held in some jurisdictions that if a trial judge deems it necessary to sustain a witness's refusal to answer certain relevant questions to protect him from incriminating himself, then his whole testimony on the subject involved should be stricken. See *People v. Cole,* 43 N.Y. 508 (1871); *McRae v. Boykin,* 50 Ga. App. 866, 179 S.E. 535, 541-542 (1935), reversed on other grounds 182 Ga. 252, 185 S.E. 246 (1936); and, *People v. McGowan,* 80 Cal. App. 293, 251 Pac. 643, 645-646 (1926).

However, what Lopinson overlooks in connection with this particular assignment of error is the fact that the questions involved here were in most part answered, and the information sought was elicited through subsequent portions of his cross-examination. The in-

cidents complained of showing Phelan's reticence are taken out of context and fail to take into account his entire testimony. Only two facts, sought to be gained in the questions involved, remained undisclosed at the close of his cross-examination, (1) where he purchased the dope pills which he admittedly used frequently, and, (2) the specific location of the test firings of the murder weapons. Under these circumstances the trial judge properly refused to strike his testimony from the record, and Lopinson's right to cross-examine was not constitutionally impinged upon. See *United States v. Cardillo,* 316 F. 2d 606 (2d Cir. 1963) ; *United States v. Toner,* 173 F. 2d 140 (3d Cir. 1949) ; *Stephan v. United States,* 133 F. 2d 87 (6th Cir. 1943), cert. denied, 318 U.S. 781 (1943) ; and, *United States v. Johnson,* 129 F. 2d 954 (3d Cir. 1942), aff'd, 318 U.S. 189 (1943).

Lopinson's final complaint about Phelan's testimony is the refusal of the trial judge to order him to remove a pair of sunglasses which he wore throughout his testimony in chief. (While testifying as a rebuttal witness he did appear without the sunglasses.) It is argued that this circumvented the jury's right to properly observe his demeanor on the stand.

There is no question but that a witness's appearance and demeanor is an important consideration for the jury in assessing his credibility. As stated by Chief Justice APPLETON in his treatise on evidence, at page 220 : " 'The witness present, the promptness and unpremeditatedness of his answers or the reverse, their distinctness and particularity or the want of these essentials, their incorrectness in generals or particulars, their directness or evasiveness, are soon detected. . . . The appearance and manner, the voice, the gestures, the readiness and promptness of the answers, the evasions, the reluctance, the silence, the contumacious silence, the contradictions, the explanations, the intelli-

gence or the want of intelligence of the witness, the passions which move or control—fear, love, hate, envy, or revenge—are all open to observation, noted and weighed by the jury.' " Quoted in 5 Wigmore, Evidence §1395, at p. 126 (3d ed. 1940). See also, *Danovitz v. Portnoy,* 399 Pa. 599, 605, 161 A. 2d 146, 149 (1960); *High v. Berret,* 148 Pa. 261, 264, 23 A. 1004 (1892); and, *Robinson v. Robinson,* 183 Pa. Superior Ct. 574, 575, 133 A. 2d 259, 260 (1957).

The fact that Phelan refused to remove the sunglasses during his appearance as a witness in chief was repeatedly brought to the attention of the jury by Lopinson's counsel, and, undoubtedly, was more helpful than harmful to his case.

In addition, at the very conclusion of the charge, the court specifically instructed the jury to consider the use of the dark glasses and Phelan's refusal to take them off as bearing on his credibility. The very last instruction given to the jury, in a supplement to the main body of the charge was: "And, secondly, I want to charge you in a matter that I had intended to during my charge relating to the wearing of dark glasses by one of the witnesses, Frank Phelan, and an evidence by him of a refusal to remove his glasses while he was being examined on his first appearance in court.

"When he appeared as a rebuttal witness, you will recall he was not wearing dark glasses.

"I charged you relating to credibility or believability of witnesses, such as their interest in the outcome of a case, their apparent intelligence, and their ability to observe clearly and relate accurately what they observed, and other facets of determining believability of a witness.

"Now, the fact that Phelan refused to remove his glasses is one of the numerous factors which you should consider in connection with your judgment as to whether or not he was telling the truth, weighing their credi-

bility or believability by every means that you have at your disposal as intelligent individuals, but particularly I wanted to relate to you concerning the dark glasses, that it's one of the numerous factors to be considered when you weigh the credibility of that particular witness."

Following the conclusion of Phelan's testimony, Lopinson's counsel requested the court to have a psychiatrist examine the witness.[7] It was asserted that the nature of his testimony was such as to raise serious doubts as to his competency. The motion was refused.

No authority has been called to our attention stating the court is compelled to have a witness psychiatrically examined at the request of a defendant, and it has been decided in a recent case that no such right on the part of the defendant exists. See *People v. Nash*, 36 Ill. 2d 275, 222 N.E. 2d 473 (1966). Regardless, the facts herein clearly support the court's ruling on the questions.

Long before trial Phelan had been examined by psychiatrists retained by the Commonwealth and also by his previous counsel, Mr. Walsh. Lopinson's trial counsel were fully aware of this before trial and had interviewed at least one of the psychiatrists involved concerning Phelan's condition. The testimony of any or all of these specialists as to any facts disclosed or conclusions reached as a result of their examinations of Phelan was available to the defense through subpoena. They did not seek to pursue it. In view of this and the fact that the court had full opportunity to hear and observe Phelan throughout his appearance on the stand, we find no abuse of discretion on its part in refusing to order an additional examination.

---

[7] A similar request had been made pretrial which was refused without prejudice to renew it subsequently if sufficient cause appeared.

Lopinson complains that the court permitted the Commonwealth to introduce prejudicial hearsay testimony at trial.

For instance, during Phelan's cross-examination, Lopinson's counsel elicited answers saying Phelan had told the victim, Malito, several days before the commission of the crimes that he had a contract to kill him. Phelan was thoroughly examined concerning the details of this conversation, throughout which Lopinson's counsel sought to ridicule the testimony and the fact that any such conversation occurred. Phelan then suggested that perhaps Malito had told someone about it and, if so, it could be verified. At trial the Commonwealth was permitted to introduce the testimony of Pasquale Malito, a son of the victim Malito, who stated his father had told him about such a conversation with Phelan on the same day Phelan had testified the colloquy occurred (i.e., the Sunday before the murders).

Under this setting the testimony was admissible for the purpose of proving the statement was made. See *Commonwealth v. Ricci*, 332 Pa. 540, 544-545, 3 A. 2d 404, 406 (1939).

Another example of testimony challenged on the ground of hearsay came into the case in this way.

Malito had entered the Dante partnership arrangement about two months before his death, and Lopinson was permitted great latitude at trial in testifying about the business transaction and his conversations with Malito in regard thereto. In part, he stated that Malito agreed to pay him $15,000 for a share in the business, later changed the offer to $5000, and as of the time of his death had paid only $3500.

In rebuttal, the Commonwealth was permitted to introduce the testimony of members of Malito's family who told of conversations with Malito before his death, which tended to refute this portion of Lopinson's tes-

timony and establish that Malito had actually paid him the $15,000 agreed upon and was not in debt to him, as Lopinson claimed.

Assuming arguendo, that the testimony was proper rebuttal, we agree that it should not have been admitted. It was pure hearsay, and we are not persuaded that it constituted a valid exception to the hearsay rule.[8] However, in view of all the testimony in the case, we are convinced it had no influence on the verdict, even though the Commonwealth did refer to it vigorously, but briefly, in its summation. It was, therefore, harmless error. See *Commonwealth v. Thomas*, 410 Pa. 160, 189 A. 2d 255 (1963), cert. denied, 375 U.S. 856 (1963); *Commonwealth v. Daily*, 280 Pa. 59, 124 A. 440 (1924); and, *Commonwealth v. Curcio*, 218 Pa. 327, 67 A. 643 (1907). Some error in a protracted trial, such as this, will unfortunately occur, but we have consistently ruled that if the error did not deprive the defendant of the fundamentals of a fair trial, we will not reverse the conviction. See *Commonwealth v. Thomas*, supra, and *Commonwealth v. Barnak*, 357 Pa. 391, 54 A. 2d 865 (1947).

At the medical examiner's inquest, Sidney Cardonick testified about two conversations he had with his friend, Lopinson, within months of the occurrence involved herein: (1) wherein Lopinson expressed a wish "to get rid" of his wife; and, (2) during which Lopinson bought some guns from the witness and said "if you ever want to get rid of anybody, let me know. I know a hit man for $300."

---

[8] The lower court admitted the evidence to show the state of mind of Malito and his intention as to his business transaction with Lopinson under an exception to the hearsay rule, recognized in *Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301 (1926), and *Commonwealth v. Wilson*, 394 Pa. 588, 148 A. 2d 234 (1959), cert. denied, 361 U.S. 844 (1959).

During, the period between the inquest and trial, Cardonick visited the office of Lopinson's counsel and told them his testimony at the inquest about these conversations was not true, and was instigated by and the result of threats made by an assistant district attorney. This interview was tape recorded.

At trial Cardonick repeated his testimony, as given at the inquest, and, despite vigorous cross-examination, insisted it was true. He acknowledged making the inconsistent statements, mentioned before, to Lopinson's counsel.

A verbatim typewritten transcript of the tape recording was read to the witness by Lopinson's counsel, and he admitted it was accurate and everything therein recorded occurred. However, the trial court refused to permit a playing of the tape itself in the presence of the jury. This is assigned as error on the ground that the ruling denied Lopinson the impeachment weight and significance of the recording itself.

". . . [T]ape recordings are admissible in evidence when they are properly identified and are a true and correct reproduction of the statements made, and when the voices are properly identified:" *Commonwealth v. Bolish,* 381 Pa. 500, 524, 113 A. 2d 464, 477 (1955). See also *Commonwealth v. Hart,* 403 Pa. 652, 660, 170 A. 2d 850, 854-855 (1961), cert. denied, 368 U.S. 881 (1961). And where a witness has made a statement inconsistent with his trial testimony, the aggrieved party has the right to introduce in evidence the entire statement for the purpose of impeachment. See 3 Wigmore, Evidence §1037, page 723 (3d ed. 1940). However, the entire contents of Cardonick's statement was given to the jury. That it was complete and accurate was unquestioned. We are not persuaded that the denial of the opportunity to repeat the contents of the contradictory statement to the jury, through the use

of the tape recording, impinged upon Lopinson's right of impeachment.

Lopinson personally testified at trial. Also several witnesses called by the defense were asked about his reputation for being a law-abiding citizen. While some limited their answers to "good" or "excellent", one embellished it by stating: "Everybody who knows Jack Lopinson thinks he is a wonderful person, a good honest person. That if you need a friend he was there."

In rebuttal, the Commonwealth called witnesses who were asked, after being qualified: "Among the people who knew him what was his reputation for truthfulness?" One such witness, David Seflin, the father of Judith Lopinson, replied: "I will have to clean that up a bit to make it acceptable to the ladies in the court room. . . . He is an unmitigated liar and scoundrel." Another such witness, Milton Jacobs, answered the question thusly: "Not truthful, a very bad liar."

Lopinson contends it was error to allow any testimony as to his reputation, and in any event the answers of Seflin and Jacobs, related above, were unresponsive, should have been stricken from the record and the jury instructed to disregard them.

Since Lopinson placed his own credibility in issue by testifying, and his general reputation in issue by other witnesses, it was perfectly proper for the Commonwealth to impeach his credibility by competent evidence showing that his general reputation for truthfulness in the "neighborhood" where he lived and was known was bad. See *Commonwealth v. Harvie*, 345 Pa. 516, 28 A. 2d 926 (1942), and *Commonwealth v. White*, 271 Pa. 584, 115 A. 870 (1922). The answers to the questions submitted should have been limited to his general reputation for truthfulness in the community, but the failure of the trial judge to so rule is not of

such moment as to require a new trial. This is particularly true in view of the embellishments, noted before, on the part of one character witness called by the defense. See *Commonwealth v. Palmer*, 184 Pa. Superior Ct. 171, 132 A. 2d 889 (1957).

## The Charge to the Jury

Lopinson urges that in his charge to the jury the trial judge, while not expressing any clear-cut opinion of defendant's guilt, did by "inference . . . let the jury know that in its opinion the defendant was guilty of first degree murder." Our reading of the charge discloses no such indication therein. The charge was completely fair and repeatedly admonished the jury that the question of guilt or innocence and the degree of guilt, if any, was for its decision alone.

Other asserted complaints about the charge are likewise devoid of merit. Instructions to a jury must be read and considered in their entirety. See *Commonwealth v. Whiting*, 409 Pa. 492, 187 A. 2d 563 (1963). When so read and considered, the instructions in the instant case were thorough, clear, impartial and free from error.

Particular complaint is voiced as to the court's instructions on the penalty to be imposed. It is urged that they "constituted a mandatory injunction to the jury to bring back the verdict of death." Again sentences therein, taken out of context, are emphasized. The nature of the penalty to be imposed was left to the sole discretion of the jury, as an objective reading of the entire charge in pertinent part will disclose. The jury was correctly instructed in part as follows: "You should consider carefully the character of this defendant, his background, his previous behavior, how he has impressed you as an individual and as a person. And you must give more weight to the character of the

individual as you understand it than to the character of the crime in this particular instance for which he stands convicted.

. . .

"You should not decide upon the sentence out of any feeling of vengeance. You may consider the age of the defendant as well as other characteristics about him.

. . .

"The death sentence should not be imposed unless you come to the conclusion that it is the proper sentence after careful consideration of the defendant as an individual, his character and background, and unless you believe that it is justified on the basis of the criminal acts for which you have found him guilty of murder in the first degree."

### Dismissal of Post-Trial Petition for Leave To File Supplemental Reasons in Support of Motion for New Trial and in Arrest of Judgment

The verdict of the jury was returned on March 4, 1965. The motions for a new trial and in arrest of judgment were filed on March 5th. They recited only the usual pro forma reasons in support thereof, but permission was granted to file additional assignments of error after the transcript of the record was filed. When this was effected, fifty-seven additional reasons in support of the motion for a new trial were entered of record and argument proceeded before the court en banc.

While the post-trial motions were thus pending before the court and before a decision thereon was rendered, Lopinson filed a petition with the court asking leave to enter supplemental reasons in support of the post-trial motions and for the opportunity of taking testimony in connection therewith.

The crux of the petition was included in two allegations: (1) That subsequent to trial, Lopinson's counsel had secured "medical proof" of Phelan's incompetency at the time he testified; and, (2) That "at a . . . proceeding before [the court] on July 27, 1965, Frank Phelan, under oath, recanted and repudiated his prior testimony and statements against" Lopinson.

The Commonwealth filed an answer to the petition requesting that Lopinson plead specifically the "medical proof" of Phelan's incompetency alleged to be in counsel's possession. Lopinson failed to respond to this request and subsequently, the court denied the petition to file supplemental reasons.

The allegation that Phelan recanted his testimony and statements against Lopinson is based on one of his statements before the court on July 27, 1965, in connection with his request for new counsel, namely, "and I just want to say for the record with reference to any criminal acts alleged to have been perpetrated by me, I now confirm nothing and strenuously deny everything."

Assuming that this amounted to a recantation of his testimony against Lopinson given publicly, under oath, on two separate occasions,[9] we have repeatedly held that we will not interfere with an order below refusing a new trial on the ground of recantation in the absence of a showing of a plain abuse of discretion. See *Commonwealth ex rel. Wilson v. Rundle,* 412 Pa. 109, 194 A. 2d 143 (1963). No abuse of discretion is evident here. In *Commonwealth v. Ruff,* 92 Pa. Superior Ct. 530, 535-536 (1928), it was stated as to recantation that: " 'We cannot interfere in this matter unless there is a plain abuse of discretion. In 16 C.J., page 1188, section 2715, the law generally upon this

---

[9] For details, see *Commonwealth v. Phelan,* 426 Pa. 265, 234 A. 2d 540 (1967).

subject is stated that "recanting testimony is exceedingly unreliable and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially . . . is this true where the recantation involves a confession of perjury . . . ." There is no form of proof so unreliable as recanting testimony.'" This language was expressly approved in *Commonwealth v. Palarino,* 168 Pa. Superior Ct. 152, 155, 77 A. 2d 665, 666 (1951), and in *Wilson,* supra, at 113, 194 A. 2d at 145.

If Lopinson's counsel were in possession of medical proof that Phelan was incompetent to testify at the Lopinson trial, certainly there should have been no reluctance to inform the court of the nature thereof. Moreover, until the court was given some definite knowledge of what this proof constituted, an intelligent appraisal of whether further proceedings were indicated was impossible.

While we have not discussed each and every asserted assignment of error, all have been carefully considered. After a consideration thereof, we find nothing therein, singly or collectively, that warrants the grant of a new trial. Lopinson received a fair trial and we repeat, the verdict and sentences were fully warranted by the evidence.

Judgments affirmed.

Mr. Justice COHEN dissents.